IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMEL BILLUPS, et al.,** | : | |
| **Plaintiffs** | : | |
| | : | **Civil Action No. 1:11-cv-01784** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **PENN STATE MILTON S. HERSHEY** | : | |
| **MEDICAL CENTER, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently pending before the Court are three separate motions to dismiss filed by the

Franklin County Defendants (Doc. No. 25), the Chambersburg Borough Defendants (Doc. No.

32), and the Penn State Milton S. Hershey Medical Center Defendants (Doc. No. 39). The

motions have been fully briefed and are ripe for disposition. For the reasons stated more fully

herein, the Court will grant the Chambersburg Borough Defendants' and the Penn State Milton

S. Hershey Medical Center Defendants' motions and will grant in part and deny in part the

Franklin County Defendants' motion.

## I.    BACKGROUND

### A.    Parties and Procedural Background

Plaintiffs Jamel Billups and Jacqueline Rosario, and their daughters, L.B. and T.R., both

minors, filed a nine-count complaint in this matter on September 27, 2011. (Doc. No. 1.) The

complaint arises from the circumstances surrounding the temporary removal of L.B. and T.R.

from Mr. Billups and Ms. Rosario's custody and alleges that fifteen Defendants violated

Plaintiffs' constitutional rights. Plaintiffs seek compensatory and punitive damages as well as

injunctive relief.

1

Plaintiffs' complaint targets three groups of Defendants, and each group has moved to dismiss the complaint.  The first group of Defendants is comprised of Franklin County, Franklin County District Attorney Matthew Fogel, Franklin County Assistant District Attorney Lauren Sulcove, Franklin County Office of Children, Youth, and Families ("CYF"), and four CYF employees – Tammie Lay, Dawn M. Watson, Kari Coccagna, and Minnie Tuner.  In essence, Plaintiffs allege that these Defendants (collectively, the "Franklin County Defendants") are responsible for pursuing dependency proceedings, implementing an unconstitutional voluntary safety plan, and investigating and prosecuting Mr. Billups in relation to charges of aggravated assault and endangering the welfare of children.  The Franklin County Defendants filed a motion to dismiss Plaintiffs' complaint on November 16, 2011.  (Doc. No. 25.)  Plaintiffs filed a brief in opposition on December 13, 2011 (Doc. No. 41), and the Franklin County Defendants filed a reply brief on January 9, 2012 (Doc. No. 52).

The second group of Defendants is comprised of Chambersburg Borough and one of its employees, Detective William C. Frisby, Jr (collectively, the "Chambersburg Borough Defendants").  Plaintiffs allege that Chambersburg Borough has an unconstitutional policy of relying on the medical opinions of the Penn State Milton S. Hershey Medical Center's Child Safety Team or, alternatively, that Detective Frisby failed to conduct an independent medical investigation regarding the cause of L.B.'s injuries.  The Chambersburg Borough Defendants filed a motion to dismiss Plaintiffs' complaint on November 28, 2011.  (Doc. No. 32.)  Plaintiffs filed a brief in opposition on December 23, 2011 (Doc. No. 46), and the Chambersburg Borough Defendants filed a reply brief on January 6, 2012 (Doc. No. 51).

The final group of Defendants is comprised of the Penn State Milton S. Hershey Medical

Center[1] ("Medical Center") and four Medical Center employees – Mark S. Dias, M.D., who is a neurosurgeon and co-director of the Medical Center's Child Safety Team ("CST"); Kathryn R. Crowell, M.D., who is a co-director of the CST; Arabinda K. Choudhary, M.D., who is the director of the pediatric neuroradiology department and a member of the CST; and Kathleen D. Eggli, M.D., who is the chair of the radiology department.  These Defendants (collectively, the "Medical Center Defendants") allegedly examined L.B.'s injuries, concluded that they were due to abuse, and provided testimony regarding their conclusions at the dependency and criminal proceedings.  On December 9, 2011, the Medical Center Defendants filed a motion to dismiss the complaint.  (Doc. No. 39.)  Plaintiffs filed a brief in opposition on January 5, 2012 (Doc. No. 49), and the Medical Center Defendants filed a reply brief on January 18, 2012 (Doc. No. 53).

B.     **Factual Background**[2]

This case arises out of a child abuse investigation that resulted in Mr. Billups and Ms. Rosario temporarily losing custody of their daughters, T.R. and L.B, and also resulted in Mr. Billups being prosecuted on criminal charges in state court.  At the time of the events giving rise to Plaintiffs' claims, T.R. was approximately two years old and L.B. was approximately four months old.  (Doc. No. 1 ¶ 19.)

---

[1] After reviewing the parties' briefs, the Court notes that the parties sometimes refer to Defendant Penn State Milton S. Hershey Medical Center as the Penn State Milton S. Hershey Medical School.  (See Doc. No. 44 at 1.)  It is clear that these references are to the same entity, which for the sake of consistency, the Court will refer to as the Medical Center.

[2] In stating the relevant facts, the Court must accept Plaintiffs' factual allegations as true and will "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."  Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004); see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  Accordingly, in describing various medical conditions, examinations, procedures, and conclusions, the Court will rely solely on the allegations of Plaintiffs' complaint.

On October 19, 2009, while Ms. Rosario was at work, Mr. Billups watched over T.R. and L.B. in the apartment he shared with Ms. Rosario.  (Id. ¶ 19.)  After hearing L.B. cry, Mr. Billups checked on her and noticed that she was arching her back and "tens[ing] up."  (Id. ¶¶ 19-20.)  He proceeded to carry her to the living room, where he noticed that she was stretching her arms out rigidly and having difficulty breathing.  (Id. ¶ 21.)  He then called Ms. Rosario, who was already en route to the apartment.  (Id.)  After Ms. Rosario arrived home, she and Mr. Billups called 911 to seek medical attention for L.B.  (Id.)  After doing so, however, they decided to take L.B. to the Chambersburg Hospital themselves, so that L.B. could receive medical attention faster.  (Id.)

After L.B. was admitted to the Chambersburg Hospital, a computed tomography ("CT") scan of L.B. was performed.  (Id. ¶ 22.)  The CT scan revealed that L.B. had a "small amount of subdural and subarachnoid hemorrhage and edema."  (Id.)  The examination did not reveal a skull fracture or any bruising.  (Id.)

## A.     L.B.'s Examinations at the Medical Center

L.B. was transferred to the Medical Center on October 20, 2009.  (Id. ¶ 23.)  On that date, magnetic resonance imaging ("MRI") and magnetic resonance venography ("MRV") examinations of L.B. were performed.  (Id.)  These examinations revealed that L.B. had thrombosis, a condition, otherwise known as a childhood stroke, in which "one or more veins that drain blood from . . . [the] brain [are] clotted."  (Id.)  The examination also revealed that one of L.B.'s veins was dilated and that there was a non-specific signal in L.B.'s neck, both of which represented an increase in blood flow "as a result of L.B.'s brain finding alternative pathways to compensate for the clotted veins in her brain."  (Id.)  No evidence of injury to L.B.'s spine or of

disruption to her spinal ligaments was detected.  (Id.)

Dr. Choudhary, the director of pediatric neuroradiology at the Medical Center and a member of its CST, evaluated the results of this examination and recorded his conclusions in a report.  (Id. ¶¶ 10, 24.)  The CST, co-directed by Drs. Dias and Crowell, evaluates patients whose injuries indicate that they may be victims of child abuse.  (Id. ¶¶ 7-9.)  In his report, Dr. Choudhary stated that the "'superficial cortical vessels on the left side [of L.B.'s brain] are not visualized' and that thrombosis was a possible explanation."  (Id. ¶ 24.)  He concluded that L.B.'s injuries were due to abuse that she suffered on October 19, 2009.  (Id. ¶ 30.)

In addition, an abdominal CT scan and skeletal surveys of L.B. were performed at the Medical Center.  (Id. ¶ 26.)  The CT scan and skeletal surveys revealed that L.B. had sixteen bilateral rib fractures in the anterior region of her ribs, none of which were acute and all of which were approximately four-to-eight weeks old.  (Id.)  Neither the CT scan nor the skeletal surveys revealed that L.B. had suffered any internal injuries associated with the rib fractures.  (Id.)

On October 22, 2009, a Medical Center radiologist reported that L.B.'s rib fractures "were 'at the anterior anxillary line' and the 'lateral aspect and anterior anxillary line.'"[3]  Unlike anterior rib fractures, posterior rib fractures are considered to be "pathognomonic, or having a virtual 100% predictive diagnostic value, of the diagnosis of abuse."  (Id. ¶ 38.)

On October 28, 2009, Dr. Crowell wrote a medical report, using Medical Center letterhead, wherein she concluded that L.B.'s injuries were caused by abuse.  (Id. ¶ 32.) Specifically, she concluded that L.B.'s sixteen rib fractures were likely the result of an incident of inflicted trauma that occurred a short time before L.B. experienced difficulty breathing.  (Id.)

---

[3] Plaintiffs do not identify the radiologist who reported this finding.

Neither Dr. Crowell nor any other doctor at the Medical Center, however, performed tests to exclude non-traumatic explanations for L.B.'s injuries, such as "a thrombophilia workup." (Id. ¶¶ 25, 27-28.)  Further, no doctor at the Medical Center asked Ms. Rosario whether she suffered from a Vitamin D deficiency or conducted tests to determine whether either Ms. Rosario or L.B. suffered from such a deficiency. (Id. ¶ 28.)  Plaintiffs allege that a Vitamin D deficiency is a cause of congenital rickets in infants, which can lead to "weak bones that fracture with birth and/or normal infant handling." (Id. ¶ 27.)

### B.     Arrest of Mr. Billups

On October 29, 2009, Detective Frisby created an affidavit of probable cause based entirely on the conclusions of Dr. Crowell recorded in her October 28, 2009 report regarding L.B.'s injuries. (Id. ¶¶ 33-34.)  The affidavit charged Mr. Billups with aggravated assault, in violation of 18 Pa. C.S. § 2702, and endangering the welfare of children, in violation of 18 Pa. C.S. § 4304. (Id. ¶ 34.)  Later that day, Mr. Billups reported to the Chambersburg Borough police station and was taken into custody. (Id. ¶ 35.)  Bail was set at $200,000. (Id.)  Mr. Billups remained in jail until December 17, 2010, when he was acquitted of all charges. (Id.)

### C.     Dependency Proceedings

On October 20, 2009, the date on which L.B. was admitted to the Medical Center and Dr. Choudhary determined that L.B.'s injuries were due to abuse, CYF obtained an ex parte order, granting CYF temporary custody of T.R. and L.B.[4] (Id. ¶ 29.)  On that date, CYF also filed a dependency petition with respect to both T.R. and L.B. (Id.)  In the petition, CYF exclusively relied on Dr. Choudhary's conclusions. (Id. ¶ 30.)

---

[4] The allegations in Plaintiffs' complaint do not make clear whether CYF obtained the ex parte order before or after L.B. was admitted to Medical Center.

The Franklin County Court of Common Pleas held a dependency hearing on December 18, 2009.  (Id. ¶ 36; Doc. No. 25-1 at 2.)  At the hearing, Dr. Crowell, who was qualified as an expert witness in the area of child abuse, testified that "an extensive screening" of L.B. was performed to determine whether she had coagulation problems, bleeding disorders, or an abnormal "metabolic workup."  (Doc. No. 1 ¶ 36.)  With respect to L.B.'s rib fractures, Dr. Crowell testified that a radiologist indicated that the fractures were posterior, not anterior.  (Id. ¶ 37.)  Plaintiffs, however, allege that no Medical Center radiologist ever made such a finding.  (Id.)  Dr. Crowell was also questioned about an October 22, 2009 report, which stated that L.B.'s rib fractures were at the anterior anxillary line.[5]  Dr. Crowell, however, explained that the reference to the anterior anxillary line in that report indicated the location from which the fractures were viewed, not that the fractures were anterior.  (Id.)

At the conclusion of the hearing, the court, having determined that the abuse allegations had been sustained, adjudicated both L.B. and T.R. dependent.  (Id. ¶ 44; Doc. No. 25-1 at 2.)  The court noted that Mr. Billups and Ms. Rosario had failed to offer a plausible alternative explanation for L.B.'s injuries and stated that, in light of the examinations performed on L.B. at the Medical Center, "it is highly unlikely that any credible expert could have come to a different conclusion at all different than that at which Dr. Crowell arrived."  (Doc. No. 1 ¶ 44.)  The court also stated that "testimony from a retained expert would not have had a high degree of likelihood of changing the result in this case, since the evidence in favor of dependency came from a treating physician and was so credible and overwhelming."  (Id.)  Plaintiffs assert, however, that Dr. Crowell was never L.B.'s treating physician.  (Id. ¶ 45.)

---

[5] As noted, Plaintiffs do not identify the Medical Center radiologist who created the October 22, 2009 report.

### D.     Criminal Proceedings

Following the dependency hearing, the Franklin County District Attorney's Office decided to pursue the criminal charges against Mr. Billups.  (Id. ¶ 40.)  The District Attorney's Office's investigation, however, began as early as October 21, 2009, when Assistant District Attorney Sulcove contacted Dr. Dias at the Medical Center to inform him that she was the prosecutor who would be handling a case against Mr. Billups.  (Id. ¶ 31.)

A preliminary criminal hearing was held on December 28, 2009.  (Id. ¶¶ 40-41.)  At the hearing, Dr. Crowell was qualified as an expert witness in the area of child abuse and testified that an extensive screening for coagulation problems and bleeding disorders, as well as a MRI examination, were performed on L.B., and that no evidence of a bleeding problem or an arterial venous malformation was detected.[6]

### E.     Contrary Expert Reports Regarding L.B.'s Injuries

In January 2010, Ms. Rosario retained Dr. Julie Mack, an assistant professor of radiology at the Medical Center, and Dr. Barnes, the director of the Pediatric MRI & CT Center at the Stanford University Medical Center's Lucile Packard Children's Hospital and a member of its CST, to evaluate the opinions of Drs. Crowell, Dias, and Choudhary regarding L.B.'s injuries. (Id. ¶¶ 46-48.)  At this time or shortly thereafter, Dr. Eggli, the chair of the Medical Center's radiology department, implemented a department policy authorizing her to either approve or not approve the reports and testimony of Medical Center doctors in legal proceedings, deny liability

---

[6] In paragraphs 42 and 43 of the complaint, Plaintiffs allege that Dr. Dias reported findings regarding L.B.'s injuries that contradicted Dr. Crowell's testimony.  They further aver that Dr. Choudhary, after conferring with Dr. Dias, altered his findings with respect to L.B.'s injuries.  Upon review of these allegations and the complaint in its entirety, it is not clear whether Plaintiffs are alleging that these events occurred before or after Dr. Crowell testified at the December 28, 2009 hearing.

insurance to those doctors whose reports and testimony were not approved, and prohibit those doctors whose reports and testimony were not approved from revealing their position at the Medical Center or using the Medical Center logo and letterhead when creating reports.  (Id. ¶ 11.)  Dr. Eggli enforced this policy against Dr. Mack after she rendered an opinion regarding L.B.'s injuries contrary to the opinions of Drs. Dias, Crowell, and Choudhary.[7]  (Id.)

Dr. Mack created a report in which she agreed with the conclusions of Dr. Barnes, who determined that L.B.'s rib fractures were anterior, that thrombosis and congenital rickets were possible causes of L.B.'s injuries, and that a more thorough "hematology/coagulopathy and vascular workup" should be performed on L.B.  (Id. ¶ 53.)  Dr. Barnes further determined that "a bone fragility disorder (e.g. maternal-fetal vitamin D deficiency with congenital rickets) should be considered and evaluated" and that there was evidence of congenital rickets of congenital rickets on L.B.'s skeletal x-rays.  (Id. ¶¶ 53, 58.)  Dr. Barnes forwarded his report to CYF.  (Id.)

After Dr. Mack and Dr. Barnes created their reports, Dr. Mack contacted Drs. Crowell and Choudhary as well as Dr. Mark Iantasco, L.B.'s attending physician, to explain why she believed that L.B.'s injuries were not due to abuse.  (Id.)  Although Dr. Mack's request to discuss the case was allegedly not well received, Dr. Crowell did invite Dr. Mack to present her findings to the CST at the Medical Center.  (Id. ¶¶ 55-56.)

**F.     Transfer of Custody and Further Reports Regarding L.B.'s Injuries**

On February 15, 2010, physical custody of L.B. and T.R. was returned to Ms. Rosario.

---

[7] The Court notes that Plaintiffs include this allegation in paragraph 11 of the complaint. Paragraph 11, however, does not explicitly identify Dr. Mack.  After reviewing the complaint in its entirety, however, the Court finds that Plaintiffs' allegations regarding a "Penn State radiologist who was sought out for a second opinion by the Billups family and rendered an opinion different than that of the Penn State Child Safety Team" refers to Dr. Mack.

(Id. ¶ 54.)  Legal custody of the children, however, remained with CYF.  (Id.)  About two weeks

later, Ms. Rosario, upon the request of Dr. Mack, was tested for vitamins D2 and D3 deficiency.

(Id. ¶ 57.)  Results of these tests revealed that Ms. Rosario's vitamin D2 level was nearly

nonexistent and that her vitamin D3 level was severely deficient, indicating that the risk of L.B.

suffering from congenital rickets was high.  (Id.)  One week later, further blood tests were

performed on L.B., revealing that she had a low protein S level, a risk factor for abnormal blood

clotting and thrombosis.  (Id. ¶ 58.)

On March 10, 2010, Mr. Billups's counsel sent Dr. Crowell a letter, informing her that

she had falsely testified regarding the location of L.B.'s rib fractures and the number of tests that

had been performed on L.B. to determine if her injuries were due to factors other than abuse.

(Id. ¶ 59.)  In the letter, which counsel also sent to CYF, counsel urged Dr. Crowell to inform the

Franklin County Court of Common Pleas of her false testimony.  (Id.)  After receiving this letter,

Dr. Crowell withdrew her invitation to Dr. Mack to present her findings to the CST, citing "risk

management" as the reason for the revocation.  (Id. ¶¶ 61-62.)

On April 5, 2010, the Franklin County Court of Common Pleas terminated its order of

dependency, and legal custody of L.B. and T.R. was returned to Ms. Rosario.  (Id. ¶ 63.)  On

April 29, 2010, the court ordered that Assistant District Attorney Sulcove provide Mr. Billups's

counsel with an expert report from Dr. Dias.  (Id. ¶ 64.)  On June 15, 2010, Dr. Dias sent a

report, created on Medical Center letterhead and including the Medical Center logo, to Assistant

District Attorney Sulcove.[8]  (Id. ¶ 67.)  In his report, Dr. Dias did not address L.B.'s low protein

---

[8] In paragraphs 67, 69, and 70 of the complaint, Plaintiffs state that certain events
occurred in June and July 2011.  (Doc. No. 1 ¶¶ 67, 69-70.)  Paragraphs 72 through 80, however,
refer to events that occurred in December 2010.  (Id. ¶¶ 72-80.)  Because the allegations in these
paragraphs appear to be written in chronological order, the Court will construe paragraphs 67,

S level or Ms. Rosario's vitamin D deficiencies.  (Id. ¶ 68.)  After receiving the report, Assistant

District Attorney Sulcove informed the court that she would call Dr. Dias as an expert witness at

Mr. Billups's trial.  (Id.)

On July 2, 2010, Dr. Mack created a report in which she concluded that thrombosis

caused L.B.'s intracranial bleeding, that L.B.'s vitamin D levels could not have been higher than

Ms. Rosario's at birth, and that the presence of a large number of asymptomatic rib fractures is

indicative of an underlying bony mineralization disorder.  (Id. ¶ 69.)

Mr. Billups's counsel apparently obtained additional medical reports regarding L.B.'s

injuries.  On May 1, 2010, Dr. Joseph Scheller issued a report in which he concluded that L.B.'s

intracranial hemorrhage was caused by a blood clot in her head and that there was no evidence of

trauma.  (Id. ¶ 65.)  In July 2010, Dr. David Ayoub issued a report in which he concluded that

L.B.'s rib fractures were not due to abuse.  (Id. ¶ 70.)  Finally, Dr. Holmes Morton, who serves

as the director of the Clinic for Special Children in Lancaster, Pennsylvania, issued a report,

concluding that Dr. Mack's findings regarding L.B.'s injuries were likely correct.  (Id. ¶ 71.)

### G.     Mr. Billups's Criminal Trial

Mr. Billups's criminal trial began on or around December 12, 2010.[9]  (Id. ¶ 72.)  During

the trial, Dr. Crowell testified that she had misrepresented the location of L.B.'s rib fractures

when she testified at the December 18, 2009 dependency hearing and at the December 28, 2009

preliminary criminal hearing.  (Id.)  She also testified that upon learning of her error, she met

with an attorney for the Medical Center, who told her that he would send a letter to the Franklin

---

69, and 70 as referring to events that occurred in June and July 2010.

[9] The Court notes that December 12, 2010 fell on a Sunday and, therefore, it is likely that
the criminal trial began on Monday, December 13, 2010.

County Court of Common Pleas as well as counsel for Mr. Billups to inform them of the error. (Id.)  Thereafter, Mr. Billups's counsel requested a copy of this letter.  (Id. ¶ 74.)  In response, counsel for the Medical Center stated that a letter had been prepared on behalf of Dr. Crowell but had not been mailed due to an oversight not attributable to Dr. Crowell.  (Id. ¶ 75.)

On December 17, 2010, a jury found Mr. Billups not guilty of the criminal charges brought against him, and Mr. Billups was released from jail.  (Id. ¶¶ 77-78.)

### H.    CYF's Voluntary Safety Plan

On December 20, 2010, CYF employees Ms. Coccagna and Ms. Tuner met with Mr. Billups and Ms. Rosario and threatened to remove L.B. and T.R. from their custody unless they agreed to the terms of a voluntary safety plan.  (Id. ¶ 79; Doc. No. 25-5.)  The terms of the plan – otherwise known as "safety actions" – were that Mr. Billups was neither to be alone with L.B. and T.R. nor to physically discipline them.  (Doc. No. 25-5 at 1.)  As a result of Ms. Coccagna and Ms. Tuner's threats, Mr. Billups and Ms. Rosario reluctantly signed the voluntary safety plan, which stated that the safety actions would be monitored through "announced and unannounced home visits" by CYF employees.  (Doc. No. 1 ¶ 80; Doc. No. 25-5 at 1.)  The plan remained in effect until June 18, 2011.  (Id. ¶ 81.)

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).  In reviewing a motion to dismiss, a court may "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."  Lum, 361 F.3d at 221 n.3.  The motion will only be properly granted when, taking all factual allegations and inferences drawn

therefrom as true, the moving party is entitled to judgment as a matter of law.  Markowitz v. Ne.

Land Co., 906 F.2d 100, 103 (3d Cir. 1990).  The burden is on the moving party to show that no

claim has been stated.  Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980).  Thus, the moving

party must show that Plaintiff has failed to "set forth sufficient information to outline the

elements of his claim or to permit inferences to be drawn that those elements exist."  Kost, 1

F.3d at 183 (citations omitted).  A court, however, "need not credit a complaint's 'bald

assertions' or 'legal conclusions' when deciding a motion to dismiss."  Morse v. Lower Merion

Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  Indeed, the United States Supreme Court has held

that while the 12(b)(6) standard does not require "detailed factual allegations," there must be a

"'showing,' rather than a blanket assertion of an entitlement to relief . . . . [F]actual allegations

must be enough to raise a right to relief above the speculative level.'"  Phillips, 515 F.3d at 231-

32 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Put otherwise, a civil

complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible."

Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 556

U.S. 662 (2009)).

## III.    DISCUSSION

        Three groups of Defendants have filed motions to dismiss Plaintiffs' complaint: the

Franklin County Defendants, the Chambersburg Borough Defendants, and the Medical Center

Defendants.  First, the Court will address the Medical Center Defendants' motion to dismiss.

The Court will then address the Franklin County Defendants' and the Chambersburg Borough

Defendants' motions jointly.

### A.    The Medical Center Defendants' Motion to Dismiss

13

The Medical Center Defendants are comprised of five individual Defendants: the Medical Center and Drs. Dias, Crowell, Choudhary, and Eggli.  The Medical Center Defendants urge the Court to dismiss the claims raised against them in Counts I, II, and VII of Plaintiffs' complaint.

Counts I and II raise substantive due process claims pursuant to the Fourteenth Amendment to the United States Constitution against all of the Medical Center Defendants, except for Dr. Eggli.  Count I alleges that these Defendants were grossly negligent or acted with reckless indifference in representing that they had ruled out non-traumatic explanations for L.B.'s injuries.  Count II alleges that they are liable for adopting an unconstitutional medical presumption of the American Academy of Pediatrics ("AAP") – that an intracranial injury in a child under one year of age is due to abuse – which tainted their investigation of L.B.'s injuries and on which the Franklin County Defendants and Chambersburg Borough Defendants relied in both the dependency proceeding and criminal proceeding against Mr. Billups.  Count VII asserts claims under the Fourth, Fifth, and Fourteenth Amendments and the Pennsylvania Constitution against the Medical Center and Dr. Eggli for implementing an expert witness policy applicable to the Medical Center's radiology department in a discriminatory manner.  Count VII further alleges a claim for ineffective assistance of counsel pursuant to the Sixth Amendment.  The Court will address each of the claims raised in these counts in turn.

     1.    *Counts I and II: Claims Against the Medical Center and Drs. Dias, Crowell, and Choudhary*

The Medical Center Defendants advance four arguments as to why the Court should dismiss the claims raised against them in Counts I and II: (1) Plaintiffs have failed to plead sufficient facts to establish that the Medical Center Defendants are state actors; (2) the Medical Center Defendants are entitled to absolute immunity; (3) the Medical Center Defendants are

entitled to qualified immunity; and (4) Plaintiffs have failed to plead facts sufficient to support substantive due process claims.  (Doc. No. 44 at 11-24.)  Because the Court finds that Plaintiffs have failed to sufficiently plead substantive due process claims in Counts I and II, the Court will not address the Medical Center Defendants' arguments regarding state action and immunity.

The substantive due process claims alleged in Counts I and II are raised pursuant to 42 U.S.C. § 1983.  "The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'"  Baker v. McCollan, 443 U.S. 137, 140 (1979).  The Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, cl. 1.  The Supreme Court has stated that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."  Troxel v. Granville, 530 U.S. 57, 66 (2000); see also Miller v. City of Phila., 174 F.3d 368, 374 (3d Cir. 1999).  This right, however, is not absolute.  Croft v. Westmoreland Cnty. Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997).  "Indeed, this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children – particularly where the children need to be protected from their own parents."  Id. In other words, "[t]he right to familial integrity . . . does not include a right to remain free from child abuse investigations."  Id.

To prevail on a substantive due process claim premised on the unwarranted infringement of familial rights, parents must demonstrate that the government action at issue was so egregious or ill conceived that it "shocks the conscience."  Miller, 174 F.3d at 375; see also Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).  This "conscience-shocking" standard is not satisfied

by demonstrating that the government action was merely negligent.  Id.  Rather, the government

action must "exceed both negligence and deliberate indifference, and reach a level of gross

negligence or arbitrariness that indeed 'shocks the conscience.'"  Id. at 375-76.  In assessing this

issue, the "fundamental liberty interests of the family unit" must be balanced against "the

compelling interests of the state in protecting children from abuse."  Croft, 103 F.3d at 1125.

"[D]isruption or disintegration of family life" due to a child abuse investigation "does not, in and

of itself, constitute a constitutional deprivation."  Id. at 1125-26.  In fact, a government actor

may constitutionally override parents' rights to the care, custody, and control of their children if

he or she possesses "some reasonable and articulable evidence giving rise to a reasonable

suspicion that a child has been abused or is in imminent danger of abuse."  Id. at 1126.  When a

government actor possesses such evidence, his or her removal of a child from the parents'

custody does not infringe on the parent's rights, even if evidence produced during the course of

an investigation demonstrates that no abuse occurred.  Id.  To the contrary, a government actor

infringes on the parents' rights by removing a child from their custody if he or she "consciously

disregard[s] a great risk that there had been no abuse."  Ziccardi v. City of Phila., 288 F.3d 57,

66 (3d Cir. 2002) (citing Miller, 174 F.3d at 375).

> a.    *Count I*

The substantive due process claim raised in Count I of Plaintiffs' complaint is based on

allegations that Drs. Dias, Crowell, and Choudhary were grossly negligent and acted with

reckless indifference in misrepresenting that L.B.'s injuries were due to abuse, which resulted in

Mr. Billups's incarceration and criminal prosecution, the dependency proceeding and removal of

L.B. and T.R. from Mr. Billups and Ms. Rosario's custody, and Mr. Billups and Ms. Rosario

being listed as perpetrators of child abuse.  (Doc. No. 1 ¶¶ 88, 103, 105, 107.)  The specific misrepresentations allegedly made by Drs. Dias, Crowell, and Choudhary are that they ruled out non-abusive causes for L.B.'s injuries, such as thrombosis, a vitamin D deficiency, or metabolic bone disease.  (Id. ¶¶ 88, 103.)  In addition, they allege that Drs. Dias and Choudhary misrepresented that L.B.'s sixteen rib fractures were due to an incident of trauma.  (Id. ¶ 105.)

First, Plaintiffs' substantive due process claim against the Medical Center and Drs. Dias, Crowell, and Choudhary must be dismissed to the extent that it is based on Mr. Billups's incarceration and criminal prosecution because the Court finds that such a claim is barred by the doctrine of Albright v. Oliver, 510 U.S. 266 (1994).  In Albright, the Supreme Court rejected the claim that a police officer's filing of criminal charges against the plaintiff denied the plaintiff substantive due process.  510 U.S. at 273.  The Supreme Court, recognizing that it "has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decision making in this uncharted area are scarce and open-ended," explained that "[t]he framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."  Id. at 271-72, 274.  The Supreme Court also noted that "the Fourth Amendment's relevance to the deprivations of liberty . . . go[es] hand in hand with criminal prosecutions."  Id. at 274.  Thus, when analyzing a Fourteenth Amendment substantive due process claim, this Court must be cognizant that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the mere generalized notion of substantive due process must be the guide for analyzing these claims."  Id. at 273 (internal quotation marks omitted); Doe v. Groody, 361 F.3d 232, 238 n.3 (3d Cir. 2004).  The Court, therefore, finds that to the extent that

17

Plaintiffs' substantive due process claim is based on Mr. Billups's incarceration and criminal prosecution it is the Fourth Amendment that provides an explicit source of protection for the claim.  Accordingly, the Court will dismiss Plaintiffs' substantive due process claim – to the extent that it is raised on this basis – with prejudice.

The Court must now assess whether Plaintiffs have sufficiently pled that the actions of the Medical Center and Drs. Dias, Crowell, and Choudhary denied Mr. Billups and Ms. Rosario substantive due process by causing them to lose custody of L.B. and T.R., to defend against a dependency petition in the Franklin County Court of Common Pleas, and to be listed as child abuse perpetrators.  At the outset, the Court notes that Plaintiffs do not allege that these Defendants actually removed L.B. and T.R. from Mr. Billups and Ms. Rosario's custody or filed the dependency petition.  Rather, Plaintiffs allege that CYF exclusively relied on these Defendants' medical opinions regarding L.B.'s injuries when it filed the dependency petition and sought custody of L.B. and T.R.  Thus, Plaintiffs are essentially asserting that the Medical Center and Drs. Dias, Crowell, and Choudhary should be held liable because their failure to properly consider non-traumatic explanations for, and misrepresentations regarding, L.B.'s injuries resulted in subsequent constitutional violations committed by the Franklin County Defendants.

The Medical Center Defendants cite no authority to oppose Plaintiffs' contention that doctors may deprive parents of substantive due process by misdiagnosing a child's injuries or making misrepresentations regarding the cause of a child's injuries.  Rather, the Medical Center Defendants cite the above-discussed authority regarding the liability of a social worker or county employee for removing a child based on allegations or suspicions of abuse.  (See Doc. No. 44 at 18-21.)  Plaintiffs do not directly address the applicable standard in their brief in opposition.

18

(See Doc. No. 49.)  Therefore, the Court will determine whether Plaintiffs' allegations support

the inference that the actions of the Medical Center and Drs. Dias, Crowell, and Choudhary

satisfy the "conscience-shocking" standard articulated by the United States Court of Appeals for

the Third Circuit.

As discussed, parents' rights to the care, custody, and control of their children is

fundamental but not absolute.  Troxel, 530 U.S. at 66; Croft, 103 F.3d at 1125.  The Third

Circuit has made clear that these rights "must be balanced against the state's interest in

protecting children suspected of being abused."  Croft, 103 F.3d at 1125.  Government

employees, therefore, violate these rights only when they "consciously disregard[] a great risk

that there had been no abuse."  Ziccardi, 288 F.3d at 66 (emphasis added).

Here, the complaint alleges that examinations of L.B. performed at the Medical Center on

October 20, 2009 revealed that L.B. had suffered a childhood stroke, had a clotted vein, and had

sixteen rib fractures.  (Doc. No. 1 ¶¶ 21, 23, 26.)  Based on these initial examinations, Dr.

Choudhary purportedly concluded that L.B.'s injuries were due to abuse that she suffered on

October 19, 2009.  (Id. ¶ 30.)  According to Plaintiffs, CYF then sought temporary custody of,

and filed a dependency petition with respect to, L.B. and T.R. on October 20, 2009.   (Id. ¶¶ 23,

29.)  Based on these allegations, the Court finds that the Medical Center Defendants possessed at

least "some reasonable and articulable evidence giving rise to a reasonable suspicion that [L.B.]

had been abused."  Croft, 103 F.3d at 1125.  Therefore, the Court finds that Plaintiffs have not

sufficiently pled that the Medical Center Defendants, in examining L.B. and rendering

conclusions on her injuries, "consciously disregarded a great risk that there had been no abuse."

Ziccardi, 288 F.3d at 66.  Accordingly, the Court finds that Plaintiffs' complaint does not

sufficiently plead that CYF's removal of L.B. and T.R. from Mr. Billups and Ms. Rosario's custody – based on the medical opinions of the Medical Center Defendants – constitutes a deprivation of substantive due process attributable to the Medical Center Defendants.  Moreover, Plaintiffs' complaint does not contain allegations, and their brief in opposition to the Medical Center Defendants' motion to dismiss does not contain arguments, sufficiently demonstrating how the Medical Center Defendants deprived Mr. Billups and Ms. Rosario of substantive due process as a result of Mr. Billups and Ms. Rosario being listed as child abuse perpetrators or being forced to defend against a dependency petition.

Accordingly, the Court will dismiss the substantive due process claims raised in Count I without prejudice to the extent that they are not based on Mr. Billups's incarceration and criminal proceeding.  The Court, however, will dismiss these claims with prejudice to the extent that they are based on Dr. Crowell's testimony at the December 18, 2009 dependency hearing and the December 28, 2009 criminal hearing, as Dr. Crowell is absolutely immune from liability for her testimony.[10]  See Hughes v. Long, 242 F.3d 121 (3d Cir. 2001) ("Witnesses, including

---

[10] In Plaintiffs' brief in opposition to the Medical Center Defendants' motion to dismiss, Plaintiffs make an argument purportedly relating to Count I regarding Dr. Crowell's testimony at Mr. Billups's criminal trial that she had testified falsely regarding the location of L.B.'s rib fractures at the December 18, 2009 dependency proceeding and the December 28, 2009 preliminary criminal hearing.  (Doc. No. 49 at 13-14.)  Plaintiffs allege that Dr. Crowell testified that upon learning of her error, she met with an attorney for the Medical Center, who told her that he would submit a letter to the court and Mr. Billups's counsel to inform them of the error. (Doc. No. 1 ¶ 72.)  Based on these allegations, Plaintiffs contend:

> A reasonable inference from these facts is that the hospital's attorney told Defendant Crowell that a letter was sent while having no intention of sending the letter due to 'risk management' reasons.  If a jury accepted this inference, this would certainly be outrageous conduct on the part of one or more of [Medical Center] Defendants. At this stage of the proceedings, Plaintiffs[] should be permitted to proceed and obtain discovery to find out the contours of these facts.

public officials and private citizens, are immune from civil damages based upon their

testimony.").

b.      *Count II*

Count II raises a substantive due process claim against the Medical Center Defendants,

save for Dr. Eggli, based on their adoption of a medical presumption promulgated by the AAP,

of which Drs. Dias, Crowell, and Choudhary are allegedly affiliated.  According to Plaintiffs, the

AAP has issued the following statement: "Although physical abuse in the past has been a

diagnosis of exclusion, data regarding the nature and frequency of head trauma consistently

support the need for a presumption of child abuse when a child younger than 1 year has suffered

an intracranial injury."  (Doc. No. 1 ¶ 111.)  Plaintiffs allege that Dr. Dias stated that this

medical presumption "was operative during the investigation of L.B.'s suspected abuse in his

report."  (Id.  ¶ 115.)  According to Plaintiffs, by adopting this medical presumption when

examining L.B.'s injuries, the Medical Center Defendants

> shifted the burden to [Mr. Billups and Ms. Rosario] to provide a non-
> accidental explanation for the trauma.  The presumption and burden
> shift omitted the possibility that L.B.'s intracranial bleeding was not
> traumatic in origin altogether and only allowed for a legal conclusion
> of either an accidental or abusive traumatic origin.

(Id. ¶ 119.)  Further, Plaintiffs aver that the adoption of this presumption caused the Medical

Center Defendants to prematurely conclude that L.B.'s injuries were not attributable to non-

_____

> . . . .

> If the Court finds some deficiency in Count I of the Plaintiffs'
> Complaint then Plaintiffs request leave to amend Count I.

(Doc. No. 49 at 13-14.)  In addition to finding that Dr. Crowell is absolutely immune from
liability based upon her testimony, the Court notes that none of the alleged substantive due
process violations raised in Count I are based on Dr. Crowell's testimony.

traumatic causes, even though Drs. Crowell and Dias later stated that alternative causes were

considered.  (Id. ¶¶ 120-22.)  According to Plaintiffs, the adoption of the AAP presumption

violated Mr. Billups and Ms. Rosario's "presumption of innocence and [right] to an unbiased

investigation" and denied them substantive due process in that they lost custody of T.R. and

L.B., had to defend a dependency petition, were listed as perpetrators of child abuse with

Childline, and Mr. Billups was incarcerated and forced to defend against criminal charges.  (Id.

¶¶ 130-32.)

The Court will first assess whether the allegations contained in Count II are sufficient to

raise a substantive due process claim.  Next, the Court will address an argument raised in

Plaintiffs' brief in opposition that Count II is raised pursuant to Monell v. Department of Social

Services of City of New York, 436 U.S. 658 (1978).

First, as discussed with respect to Count I, the Court finds that, in accordance with the

Supreme Court's opinion in Albright, to the extent that Plaintiffs' claims in Count II are based

on Mr. Billups's incarceration and criminal prosecution, it is the Fourth Amendment, and not the

Fourteenth Amendment's guarantee of substantive due process, that provides an explicit source

of protection for the claims.  See Albright, 510 U.S. at 273-74.  Accordingly, the Court will

dismiss the substantive due process claim raised in Count II with prejudice to the extent that it is

raised on this basis.

Next, the Court will determine whether Plaintiffs have sufficiently pled that the Medical

Center Defendants' adoption of the AAP presumption denied Plaintiffs substantive due process

in relation to the dependency petition and the removal of L.B. and T.R. from their parents'

custody.  Even accepting Plaintiffs' allegation that the Medical Center and Drs. Dias, Crowell,

and Choudhary adopted the AAP presumption as true, Plaintiffs have not pled facts sufficiently demonstrating that they were entitled to a presumption of innocence during the Medical Center Defendants' investigation of L.B.'s injuries and at the dependency proceedings or how the Medical Center Defendants' adoption of the presumption denied them substantive due process. As discussed, the Third Circuit has recognized that parents' rights to the care, custody, and control of their children "does not include a right to remain free from child abuse investigations." Croft, 103 F.3d at 1125.  The Third Circuit has further stated that there may be circumstances in which a government actor may justifiably remove a child from his or her parent's custody "even where later investigation proves no abuse occurred" so long as the government actor possesses "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id. at 1126.  Parents, therefore, are not entitled to a presumption of innocence during the pendency of a child abuse investigation.  Accordingly, regardless of whether the Medical Center Defendants adopted the AAP presumption, the Court finds that – as discussed with respect to the claims raised in Count I –  the Medical Center Defendants, upon examining L.B.'s injuries, possessed "reasonable and articulable evidence" indicating that L.B. had been abused.

Moreover, Plaintiffs point to no legal authority to support their contention that the presumption of innocence applies in dependency proceedings.  Under Pennsylvania law, dependency proceedings are non-criminal proceedings in which the presumption of innocence does not apply.  See C.S. v. Dep't of Pub. Welfare, 972 A.2d 1254, 1262 (Pa. Commw. 2009) (citing J.G. v. Dep't of Pub. Welfare, 795 A.2d 1089, 1093 (Pa. Commw. 2002).

Although the Court will dismiss Count II without prejudice in accordance with the above

analysis, the Court will also address Plaintiffs' contention, raised in their brief in opposition, that Count II is actually raised pursuant to <u>Monell</u>.  (Doc. No. 49 at 16.)  In <u>Monell</u>, the Supreme Court held that to establish municipal liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that "action pursuant to official municipal policy" caused his or her injury.  436 U.S. at 691.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1359 (2011) (citations omitted). In other words, municipalities can only held liable under Section 1983 for "their <u>own</u> illegal acts. They are not vicariously liable under § 1983 for their employees' actions."  <u>Id.</u> (internal citations and quotation marks omitted) (emphasis in original).

To support their contention that Count II is raised pursuant to <u>Monell</u>, Plaintiffs cite <u>Gleeson v. Robson</u>, No. 02-cv-1747, 03-cv-0552, 2005 WL 1210948 (M.D. Pa. May 6, 2005). (Doc. No. 49 at 16.)  In <u>Gleeson</u>, the court recognized that: "To survive summary judgment on a <u>failure to train theory</u>, a plaintiff must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference."  2005 WL 1210948, at *35 (citations, brackets, and internal quotation marks omitted) (emphasis added).  The court then recited the Third Circuit's "triparite test for establishing the deliberate indifference requirement." <u>Id.</u>  Plaintiffs appear to rely on <u>Gleeson</u> to support the contention that the Medical Center has failed to train its employees that applying the AAP presumption leads to constitutional violations.  This argument and reliance on <u>Gleeson</u>, however, is misplaced, as Plaintiffs fail to sufficiently plead facts in support of a failure-to-train claim against the Medical Center

24

Defendants in Count II.  Accordingly, to the extent that Plaintiffs have attempted to allege a failure-to-train claim in Count II, such a claim is dismissed without prejudice.

2.    *Count VII: Claims Against the Medical Center and Dr. Eggli*

Count VII of Plaintiffs' complaint contends that the Medical Center and Dr. Eggli denied Mr. Billups due process, effective assistance of counsel, and the prospect of a fair trial in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments as well as the Pennsylvania Constitution by implementing an expert witness policy in a discriminatory manner.[11] Specifically, Plaintiffs aver that Dr. Eggli, the chair of the Medical Center radiology department, implemented a department policy, authorizing her to either approve or not approve the reports and testimony of Medical Center doctors in legal proceedings, deny liability insurance to those doctors whose reports and testimony were not approved, and prohibit doctors whose reports and testimony were not approved from revealing their position at the Medical Center or using the Medical Center logo and letterhead when creating reports.  (Doc. No. 1 ¶ 11.)

According to Plaintiffs, in January 2010, Ms. Rosario sought a medical opinion regarding L.B.'s injuries from Medical Center radiologist Dr. Julie Mack.  (Id. ¶ 156.)  Dr. Mack thereafter issued a report on L.B.'s injuries in which she disagreed with the conclusion that L.B.'s injuries were due to abuse.  (Id. ¶ 162.)  Plaintiffs aver that Dr. Dias spoke with Dr. Eggli regarding Dr. Mack's findings and demanded that Dr. Eggli forbid Dr. Mack from creating reports or testifying on behalf of criminal defendants or on behalf of parents in dependency proceedings.  (Id. ¶ 170.)

---

[11] Because Count VII pertains only to the alleged violation of Mr. Billups's constitutional rights in the context of his criminal prosecution and contains no allegations that Ms. Rosario's constitutional rights were violated, the Court will dismiss Count VII to the extent that it attempts to seek relief for Ms. Rosario, as Ms. Rosario lacks standing.  See Pa. Prison Soc'y v. Cortes, 622 F.3d 215, 228 (3d Cir. 2010).

On October 1, 2010, Dr. Eggli allegedly sent Dr. Mack a letter regarding her report on L.B.'s injuries.  (Id. ¶ 171.)  In that letter, Dr. Eggli informed Dr. Mack that she "may not use [Medical Center] stationary or logo, nor . . . [her] title as faculty in communications regarding this expert testimony . . . [and that her] testimony will not be covered insured or indemnified by the Department of Radiology or [the Medical Center]."  (Id.)  As a result, when Dr. Mack testified at Mr. Billups's criminal trial on December 14, 2010, she was neither permitted to testify that she was an assistant professor of radiology at the Medical Center nor covered by Medical Center liability insurance.  (Id. ¶ 180.)  Conversely, Drs. Choudhary, Crowell, and Dias were allegedly covered by Medical Center liability insurance and were permitted to testify that they were employed by the Medical Center when they testified at the trial.  (Id. ¶¶ 172-74, 177-79.)

According to Plaintiffs, the expert witness policy promulgated by Dr. Eggli "heavily discriminates in favor of physicians writing reports and testifying for the Commonwealth's prosecution and against physicians writing reports and testifying for defendants" and "undermines the judicial process by depriving judges and juries of information relevant and necessary to rendering fair and impartial decisions."  (Id. ¶¶ 183, 185.)  Accordingly, Plaintiffs contend that Mr. Billups was denied effective assistance of counsel because the Medical Center and Dr. Eggli prevented Mr. Billups's counsel from obtaining an expert report with the support of Medical Center.  Plaintiffs further contend that this policy denied Mr. Billups due process and "the right to prepare a defense."  (Id. ¶ 187.)  In addition, Plaintiffs seek injunctive relief for themselves "and for all other defendants similarly situated, to prohibit [the Medical Center] from withholding use of faculty title in communications, withholding use of [the Medical Center] letterhead and logo, and withholding the benefit of liability insurance for physicians testifying

26

for the defense . . . ."  (Id. ¶ 190.)  They seek further injunctive relief in the form of the Medical

Center "uniformly consider[ing] activity by employees on behalf of accused parents to be within

the scope of their employment as well."  (Id.)  The Court will address each contention in turn.

a.    *Sixth Amendment Ineffective Assistance of Counsel Claim*

First, Plaintiffs claim that the Medical Center and Dr. Eggli's expert witness policy

violated Mr. Billups's Sixth Amendment right to effective assistance of counsel.  To assess

whether counsel's performance is constitutionally ineffective, courts apply the standard set out

by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, "a

criminal defendant may demonstrate that his representation was constitutionally inadequate by

proving: (1) that his attorney's performance was deficient, i.e., unreasonable under prevailing

professional standards; and (2) that he was prejudiced by the attorney's performance."  United

States v. Booth, 432 F.3d 542, 546 (3d Cir. 2005) (emphasis added).  Plaintiffs' claim that the

Medical Center and Dr. Eggli violated Mr. Billups's right to effective assistance of counsel fails

as a matter of law because Plaintiffs' complaint contains no allegations that Medical Center or

Dr. Eggli ever acted as Mr. Billups's attorney.  Plaintiffs offer no support for the position that a

claim of ineffective assistance of counsel can be brought against a third party.[12]  Accordingly,

because an ineffective assistance of counsel claim cannot be brought against a third party, the

Court will dismiss this claim with prejudice.

b.    *Claims Under the Fourth, Fifth, and Fourteenth Amendments and the Pennsylvania Constitution*

---

[12] In fact, Plaintiffs do not even specifically address this claim in their brief in opposition. Rather, they merely state that they have asserted a claim of ineffective assistance of counsel based on the Medical Center Defendants' adoption of the AAP presumption.  (Doc. No. 49 at 24.)  Plaintiffs, however, do not expound on how the alleged adoption of that presumption constitutes ineffective assistance of counsel.

Next, Plaintiffs assert that the Medical Center and Dr. Eggli violated Mr. Billups's due process rights and right to prepare a defense pursuant to the Fourth, Fifth, and Fourteenth Amendments and the Pennsylvania Constitution. The Medical Center Defendants urge the Court to dismiss these claims for failure to state a claim upon which relief can be granted. Specifically, they assert that Plaintiffs have merely cited these sources of protection and have not sufficiently alleged any constitutional violations. (Doc. No. 44 at 25-26.)

After reviewing Plaintiffs' complaint and brief in opposition, the Court finds that Plaintiffs have failed to sufficiently articulate any of these claims. First, paragraph 187 of the complaint and a heading on the second-to-last page of Plaintiffs' brief in opposition merely states that Plaintiffs' Fourth Amendment rights were violated. (Doc. No. 1 ¶ 187; Doc. No. 49 at 24.) Second, Plaintiffs do not address the Medical Center Defendants' argument that their Fifth and Fourteenth Amendments are attempts to plead procedural due process claims or that they have failed to state a claim for relief pursuant to the Pennsylvania Constitution in their brief in opposition. Rather, they appear to contend that the Medical Center Defendants' adoption of the AAP presumption violated these rights. Because Plaintiffs have failed to provide any legal support or analysis to challenge the grounds on which the Medical Center and Dr. Eggli seek dismissal, the Court finds that Plaintiffs have not sufficiently pled claims under the Fourth, Fifth, or Fourteenth Amendments or pursuant to the Pennsylvania Constitution. Accordingly, the Court will dismiss these claims without prejudice.

c.   *Injunctive Relief*

Plaintiffs also seek injunctive relief in Count VII for themselves and all other defendants similarly situated to prohibit the Medical Center and Dr. Eggli "from withholding use of faculty

28

title in communications, withholding use of [the Medical Center] letterhead and logo, and

withholding the benefit of liability insurance for physicians testifying for the defense . . . ."

(Doc. No. 1 ¶ 190.)  The Medical Center Defendants contend that Plaintiffs' request for

injunctive relief must be dismissed because Mr. Billups lacks standing to pursue this relief, "as

he will suffer no present, or even foreseeable harm, and stands in no special relationship with

any other allegedly similarly situated defendants."  (Doc. No. 44 at 26.)  In opposition, Plaintiffs

argue that Mr. Billups and Ms. Rosario have filed a request to expunge the report of Mr.

Billups's abuse of L.B., and that a hearing before the Department of Public Welfare, Bureau of

Hearings and Appeals is currently pending.  (Doc. No. 49 at 21-22.)  They assert that Dr. Mack

is likely to testify at this hearing, and that the Medical Center expert witness policy will

unconstitutionally bar her from revealing her employer, which is information that would give

credence to her testimony.  (Id. at 22-24.)

   Although Section 1983 authorizes equitable relief, an "injunction is to be used sparingly,

and only in a clear and plain case."  Rizzo v. Goode, 423 U.S. 362, 378 (1976) (internal

quotations omitted).  "[P]ast exposure to illegal conduct does not in itself show a present case or

controversy regarding injunctive relief . . . if unaccompanied by continuing, present adverse

effects."  City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (internal quotations omitted).

In order to have standing under Article III of the United States Constitution, plaintiffs must

show:

> (1) [they have] suffered an "injury in fact" that is (a) concrete and
> particularized and (b) actual or imminent, not conjectural or
> hypothetical;
>
> (2) the injury is fairly traceable to the challenged action of the
> defendant; and

(3) it is likely, as opposed to merely speculative, that the injury will
be redressed by a favorable decision.

Cortes, 622 F.3d at 228 (quoting Friends of the Earth, Inc. v. Laidlaw, 528 U.S. 167, 180-81

(2000)).

First, the Court finds that the allegations of Plaintiffs that other similarly situated

families, may suffer injury due to the Medical Center expert witness policy does not establish a

case or controversy.  Plaintiffs lack standing to seek injunctive relief on behalf of other families.

Accordingly, the Court will dismiss this request for injunctive relief with prejudice.

Second, with respect to the allegations that Plaintiffs may suffer injury if Dr. Mack is

unable to testify that she is an employee of the Medical Center at the upcoming Department of

Public Welfare hearing, the Court finds that even if Plaintiffs have standing to pursue injunctive

relief on this basis, their allegations that the expert witness policy is applied in a discriminatory

manner does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  Iqbal, 129 S. Ct. at 1949.  Plaintiffs' complaint only contains

"conclusory statements" of discrimination by the Medical Center and Dr. Eggli.  Plaintiffs assert

that the Medical Center and Dr. Eggli, through the expert witness policy, discriminate against

Medical Center doctors who testify on behalf of criminal defendants or parents in dependency

proceedings by depriving them of liability insurance, the ability to create reports using Medical

Center letterhead or containing the Medical Center logo, and stating that they are employees of

the Medical Center.  The only factual allegations that potentially support Plaintiffs' argument is

that Dr. Mack was not permitted to reveal her employer when testifying on Mr. Billups's behalf

and that her invitation to present her findings regarding L.B.'s injuries to the CST was revoked.

These facts alone are not sufficient to support a reasonable inference that these decisions were

made because Dr. Mack was testifying on behalf of Mr. Billups.  Plaintiffs have not identified

any similarly situated criminal defendants or parents defending against dependency petitions

who retained medical experts from the Medical Center who were, in turn, discriminated against

simply because they testified on behalf of such individuals.  Thus, the Court finds that the

allegations that the policy discriminated against Dr. Mack, without a showing that the decisions

concerning Dr. Mack's findings and testimony were part of a discriminatory policy or practice,

do not establish a claim to injunctive relief in the form of an order to establish nondiscriminatory

policies.  Accordingly, the Court will dismiss this claim without prejudice.

     **B.**     **The Franklin County Defendants' and the Chambersburg Borough Defendants' Motions to Dismiss**

The Court will next consider the motions to dismiss filed by the Franklin County

Defendants and the Chambersburg Borough Defendants.  These Defendants urge the Court to

dismiss the claims raised against them in Counts III, IV, V, VI, VIII, and IX of the complaint.

Count III of Plaintiffs' complaint is brought against CYF, and Count VIII is brought

against CYF and Franklin County.  Count IX alleges claims against CYF employees Kari

Coccagna and Minnie Tuner.  Count IV raises claims against CYF employees Tammie Lay and

Dawn M. Watson.  In Count V, Plaintiffs bring claims against Franklin County District Attorney

Matthew Fogel as well as Chambersburg Borough.  Finally, in Count VI, Plaintiffs raise claims

against Franklin County Assistant District Attorney Lauren Sulcove as well as Chambersburg

Borough Detective William C. Frisby, Jr.  The Court will address each of these counts in turn.

     1.     *Counts III and VIII: Claims Against CYF*

Counts III and VIII of Plaintiffs' complaint allege substantive due process claims against

CYF under 42 U.S.C. § 1983.  In their motion to dismiss, the Franklin County Defendants argue,

<u>inter</u> <u>alia</u>, that the claims raised in these counts against CYF must be dismissed because CYF and Franklin County are a single entity.  (Doc. No. 36 at 19-20.)  Plaintiffs do not respond to this argument in their brief in opposition.

The Third Circuit, as well as other courts, has recognized that a municipality and a department or agency of a municipality are a single entity for the purposes of Section 1983 liability.  <u>See</u> <u>Peterson v. City of Uniontown</u>, 441 F. App'x 62, 63 n.1 (3d Cir. 2011) (citing <u>Bonenberger v. Plymouth Twp.</u>, 132 F.3d 20, 25 n.4 (3d Cir. 1997); <u>Dunsmore v. Chester Cnty.</u> <u>Children & Youth Servs.</u>, No. 92-cv-3746, 1994 WL 446880, at *1 (E.D. Pa. Aug. 18, 1994) (holding that Chester County Children & Youth Services was not a separate entity subject to suit apart from Chester County).  Further, Plaintiffs acknowledge in paragraph 12 of their complaint that CYF is an agency of the Commonwealth.  (Doc. No. 1 ¶ 12.)  Therefore, CYF is not a "person" as defined by Section 1983, and Plaintiffs' claims brought against it in Counts III and VIII must be dismissed.

2.     *Count IX: Claims Against Ms. Coccagna and Ms. Tuner*

Count IX is raised against CYF employees Ms. Coccagna and Ms. Tuner, who presented Mr. Billups and Ms. Rosario with a voluntary safety plan on December 20, 2010.  Plaintiffs allege that Ms. Coccagna and Ms. Tuner violated their Fourteenth Amendment right to due process and their Fourth Amendment right to be secure in their home by: (1) failing to provide them with due process before presenting the plan to them; (2) threatening to remove L.B. and T.R. from their custody if they did not agree to the terms of the plan; (3) failing to ensure that the plan included notices of the parental rights provided in 55 Pa. Code § 3130.65; and (4) extending the plan beyond thirty days in violation of 55 Pa. Code § 3130.65.  (Doc. No. 1 ¶¶ 212-15.)

32

As discussed with respect to Counts I and II, for a parent to prevail on a substantive due process claim premised on the unwarranted infringement of familial rights, the government action at issue must be so egregious or ill conceived that it "shocks the conscience." Miller, 174 F.3d at 375; see also Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008). To satisfy this "conscience-shocking" standard, a plaintiff must demonstrate that the government action "exceed[ed] both negligence and deliberate indifference, and reach[ed] a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Id. at 375-76. A government actor infringes on parents' fundamental rights to the care, custody, and control of their children when he or she "consciously disregard[s] a great risk that there had been no abuse." Ziccardi, 288 F.3d at 66 (citing Miller, 174 F.3d at 375). Conversely, when a government actor possesses "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse," his or her removal of a child from the parents' custody does not constitute an infringement on the parents' rights to familial integrity. Croft, 103 F.3d at 1126.

Before addressing whether Ms. Coccagna and Ms. Tuner denied Mr. Billups and Ms. Rosario due process by presenting them with a voluntary safety plan and threatening to remove L.B. and T.R. from their custody if they did not agree to the terms of the plan, the Court finds it necessary to clarify the purpose and use of a voluntary safety plan, which Plaintiffs, in various portions of their complaint and brief in opposition, also refer to as a voluntary placement agreement. According to the Office of Children, Youth and Families Bulletin regarding the safety assessment and planning process:

> When immediate threats to the child exist, a plan of safety must be
> put in place to ensure the child's safety. A Safety Plan is the written

> document that identifies under what conditions a child will remain
> safe in the situation in which they are currently residing (in-home or
> out-of-home) and a method for monitoring compliance with the plan.
> The safety plan is developed based on the results of the safety
> assessment and safety decision.[13]

(Doc. No. 25-4 at 7.)  Unlike a voluntary safety plan, which may allow children to remain in the

custody of their parents and continue to reside in their parents' home, a voluntary placement

agreement is an agreement under which the "[c]ustody of a child may be temporarily transferred

to the county agency for no more than 30 days if the child's parents . . . freely enter into a written

agreement with the county agency."  55 Pa. Code § 3130.65(a).  A voluntary placement

agreement may not be extended beyond thirty days without a court order and must contain four

statements regarding parental rights.[14]  Id. §§ 3130.65(a)-(b).

---

[13] The Court notes that this Bulletin is not attached to or explicitly referenced in Plaintiffs' complaint but is discussed in several parts of Plaintiffs' brief in opposition to the Franklin County Defendants' motion to dismiss.  (See Doc. No. 41 at 10, 13-14.)  Therefore, the Court finds that it may properly consider the Bulletin as a document that forms the basis of a claim.  See Lum, 361 F.3d at 221 n.3.

[14] The statements that must be included are:

> (1) A statement of the parents' or legal guardian's right to be
> represented by legal counsel or other spokesperson during
> conferences with the county agency about voluntary placement.
> (2) A statement of the parent's or legal guardian's right to refuse to
> place the child.
> (3) A statement of the parents' or legal guardian's right to visit the
> child, to obtain information about the child, and to be consulted about
> and approve medical and educational decisions concerning the child
> while the child is in voluntary placement.
> (4) A statement of the parents' or legal guardian's right to the
> immediate return of the child upon request of the parent or guardian,
> unless the court orders the legal custody of the child to be transferred
> to the county agency.

55 Pa. Code § 3130.65(a)(1)-(4).

At issue in this action is a voluntary safety plan, not a voluntary placement agreement. Despite Plaintiffs' claims that the agreement signed by Mr. Billups and Ms. Rosario on December 20, 2010 was a voluntary placement agreement, the two-page document that they signed is clearly titled "SAFETY PLAN," and the words "safety plan" appear throughout the document. (Doc. No. 25-5.)  Further, neither Plaintiff's complaint nor the document state that custody of L.B. and T.R. was transferred to a Franklin County agency on December 20, 2010, or at anytime thereafter.  In fact, the complaint indicates that although the plan remained in effect until June 18, 2011, L.B. and T.R. remained in their own home under the care of both Mr. Billups and Ms. Rosario during that time.  Plaintiffs' allegations that CYF nevertheless obtained "protective capacity" custody of L.B. and T.R. by virtue of the plan, which are not supported by any legal authority, do not demonstrate that the December 20, 2010 safety plan was, in fact, a voluntary placement agreement.  (See Doc. No. 41 at 15-17.)  The Court, therefore, finds that Plaintiffs have not pled facts demonstrating that Mr. Billups and Ms. Rosario agreed to a voluntary placement agreement on December 20, 2010, or at any other time.  Rather, the facts demonstrate that Mr. Billups and Ms. Rosario agreed to the terms of, and signed, a voluntary safety plan on December 20, 2010.  Accordingly, the requirements codified in 55 Pa. Code § 3130.65 did not apply to the December 20, 2010 plan, and the Court must dismiss Plaintiffs' claims that Ms. Coccagna and Ms. Tuner violated Section 3130.65 by extending the plan beyond thirty days without a court order and by not including notices of parental rights in the plan.

Now, the Court will address Plaintiffs' claims that Ms. Coccagna and Ms. Tuner violated Mr. Billups and Ms. Rosario's constitutional rights by presenting them with a voluntary safety plan without first providing them any due process and by threatening to immediately remove

L.B. and T.R. from their custody if they did not agree to sign the plan and agree to its terms.

Lawsuits challenging voluntary safety plans have been rare, and the Franklin County Defendants point the Court to only two decisions to support their position that the use of the voluntary safety plan at issue in this action was constitutional.  See Smith v. Williams-Ash, 520 F.3d 596 (6th Cir. 2008); Dupuy v. Samuels, 465 F.3d 757 (7th Cir. 2006).  They contend that the remaining claims raised in Count IX must be dismissed because: (1) Mr. Billups and Ms. Rosario were informed of their right to appeal the terms of the voluntary safety plan in a Family Service Plan that was presented and signed in conjunction with the voluntary safety plan; (2) the Sixth and Seventh Circuits have upheld the use of voluntary safety plans in factually similar circumstances; and (3) alternatively, Ms. Tuner and Ms. Coccagna are entitled to qualified immunity.  (Doc. No. 36 at 25-31.)

First, as Plaintiffs correctly point out, there are no notices of any right to appeal on the two-page voluntary safety plan itself.  (Doc. No. 25-5; Doc. No. 41.)  Although the Franklin County Defendants have attached a copy of a Family Service Plan as an exhibit, none of Plaintiffs' claims are based on the terms of, or the signing of, the Family Service Plan.  (See Doc. No. 25-6.)  Therefore, the Court will not consider this exhibit in ruling on the instant motion to dismiss and, in turn, will not grant the motion on this basis.

Second, the Court will consider the constitutionality of the voluntary safety plan presented to Mr. Billups and Ms. Rosario and whether Ms. Coccagna's and Ms. Tuner's threats to immediately remove L.B. and T.R. from their custody if they did not sign the plan denied them due process.  In Dupuy, the Seventh Circuit assessed the constitutionality of safety plans similar to the one at issue here.  The court held that the decision to agree to a safety plan is

36

optional with the parents and, therefore, the Constitution does not entitle parents to a hearing

before they are offered the option of agreeing to a plan.  465 F.3d at 761-62.  The court

explained:

> There is no right to a hearing when no substantive right has been
> infringed or is threatened with being infringed.  The state does not
> force a safety plan on the parents; it merely offers it.  Parents are
> entitled to a hearing if their parental rights are impaired, but the offer
> of a settlement no more impairs those rights than a prosecutor's offer
> to accept a guilty plea impairs the defendant's right to trial by jury.

Id. at 761.

Further, the court in Dupuy addressed the argument that safety plans are inherently

coercive when agencies force parents to sign them or face the threat of their children being

removed from their custody.  Id. at 763-63.  The court analogized an agency's threat to remove

the children to a plaintiff's threat to press a case to trial in order to induce a defendant to settle,

recognizing that "[i]t is not a forbidden means of 'coercing' a settlement to threaten merely to

enforce one's legal rights."  Id. at 762.  The court, however, also noted that coercion – which, in

this context, "is more aptly described as duress or extortion" – is objectionable "when illegal

means are used to obtain a benefit."  Id.  The court found that the agencies had not used

objectionable coercion because the safety plan informed parents of the possibility that failure to

agree to the plan could result in the State's Attorney's Office obtaining a court order to remove

their child from the home, a threat that was grounded in proper legal authority.  Id. at 762-63.

A threat not grounded in proper legal authority was found to have been used by an

employee of a county agency in Croft, a Third Circuit decision discussed by Plaintiffs in their

brief in opposition as well as by the Seventh Circuit in Dupuy.  Croft concerned the threat to

remove a child from her parents after the County Children's Bureau received an anonymous tip

and phone call that the child's father had sexually abused her, that the child had been outside of her house naked, and that the child indicated that she slept in the same bed as her parents. 103 F.3d at 1126. Based only on this tip and phone call, the defendant's case worker gave an ultimatum to the child's father that if he did not leave the house for the duration of an abuse investigation, the agency would immediately place the child in foster care. Id. at 1124-25. The Third Circuit found this ultimatum to be an "arbitrary abuse of government power," reasoning that the case worker did not have reasonable grounds to believe that sexual abuse had occurred or was imminent because she had no evidence beyond the anonymous tip and phone call and had testified that "she had no opinion one way or the other" after interviewing both of the child's parents. Id. at 1127.

In essence, Plaintiffs argue that Mr. Billups and Ms. Rosario were given an ultimatum similar to the one made by the case worker in Croft, that is, an ultimatum not grounded in proper legal authority. First, the Court notes that, like the safety plans at issue in Dupuy, the December 20, 2010 voluntary safety plan signed by Mr. Billups and Ms. Rosario informed them of the possibility that if they failed to comply with the terms of the plan, or if L.B. and T.R. were otherwise made unsafe in their home, "consideration [would] be made for the removal and placement of the child(ren) to ensure safety." (Doc. No. 25-5.) Presumably, this statement refers to lawful measures that CYF may have pursued to transfer custody of L.B. and T.R. to Franklin County had Mr. Billups and Ms. Rosario not signed the plan or properly followed its terms. Second, although Plaintiffs analogize the facts of Croft to the instant matter, there is at least one significant distinction. In the instant action, unlike in Croft, CYF employees had conducted an abuse investigation and a dependency proceeding was held, which resulted in L.B.

and T.R. being temporarily adjudicated as dependents of the Commonwealth.  Therefore, unlike

the case worker in <u>Croft</u>, who issued an ultimatum curtailing a father's parental rights without

proper legal grounds, Ms. Coccagna and Ms. Tuner may have had proper legal grounds to do

issue such an ultimatum.  This, however, is not clear.

Viewing the allegations of the complaint in the light most favorable to Plaintiffs, the

Court finds that Plaintiffs have pled sufficient facts to demonstrate that Ms. Coccagna and Ms.

Tuner may have lacked the proper legal grounds to coerce Mr. Billups and Ms. Rosario into

signing the voluntary safety plan under the threat of immediately removing L.B. and T.R. from

their custody.  Accordingly, the Court will deny the Franklin County Defendants' motion to

dismiss the claims relating to Ms. Coccagna and Ms. Tuner's presenting the plan to Mr. Billups

and Ms. Rosario without first providing them with due process and Ms. Coccagna and Ms.

Tuner's alleged threats to immediately remove L.B. and T.R. raised in Count IX.  Further, the

Court notes that these allegations could give rise to the conclusion that Ms. Coccagna and Ms.

Tuner deliberately denied Mr. Billups and Ms. Rosario due process and deliberately coerced

them into signing the plan without proper legal grounds.  Accordingly, although qualified

immunity should be decided at the earliest possible stage in the litigation, these allegations

prevent the Court from making the qualified immunity determination at this juncture.  <u>Anderson</u>

<u>v. Creighton</u>, 483 U.S. 635, 646 n.6 (1987).

3.      *Count VIII: Claims Against Franklin County*

In Count VIII, Plaintiffs contend that their substantive due process rights, as well as 55

Pa. Code § 3130.65, were violated by two policies of Franklin County: (1) the policy of

extending voluntary safety plans and voluntary safety agreements beyond thirty days; and (2) the

39

policy of not including notices of due process rights to parents in voluntary safety plans.  Count

VIII also alleges that Franklin County denied Plaintiffs due process and violated Plaintiffs'

Fourth Amendment rights by failing to properly train its employees: (1) "that requiring a parent

not to be alone with his children is a curtailment of the fundamental right of a parent to the care,

custody and control of his children;" (2) "that requiring a parent to [agree to] unannounced and

announced visits by [CYF] employees is a curtailment of the fundamental right of a person to be

secure in [his or her] home from warrantless government intrusion;" and (3) "about the

procedural due process considerations of the use [of] coercive threats to remove children if

parents [do not] agree to [voluntary safety plans] and/or [voluntary placement agreements] that

curtail parental rights to the care[,] custody[,] and control of their children and the right to be

secure in their home without warrantless government intrusion."  (Doc. No. 1 ¶ 202.)  In addition

to compensatory and punitive damages, Plaintiffs seek an injunction to prevent Franklin County

from continuing to coercively use voluntary safety plans against other similarly situated families.

        As discussed with respect to Count II, the Supreme Court has held that a plaintiff must

show that "action pursuant to official municipal policy" caused his or her injury in order to

establish municipal liability under 42 U.S.C. § 1983.  <u>Monell</u>, 436 U.S. at 691.  "Official

municipal policy includes the decisions of a government's lawmakers, the acts of its

policymaking officials, and practices so persistent and widespread as to practically have the

force of law."  <u>Connick</u>, 131 S. Ct. at 1359 (2011) (citations omitted).  In other words, local

governments can only held liable under Section 1983 for "their <u>own</u> illegal acts.  They are not

vicariously liable under § 1983 for their employees' actions."  <u>Id.</u> (internal citations and

quotation marks omitted) (emphasis in original).

The Third Circuit has recognized three circumstances in which a municipality may be held liable under Section 1983:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes.

McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005) (internal citations omitted).  As stated, Plaintiffs must demonstrate that the action taken pursuant to an official municipal policy caused their injury.  See, e.g., Monell, 436 U.S. at 691.

The Court will first address the contentions that Franklin County's policies denied Plaintiffs due process.  Next, the Court will assess whether Plaintiffs have sufficiently pled failure-to-train claims.  Finally, the Court will address Plaintiffs' request for injunctive relief.

### a.   *Franklin County Policies*

As discussed with respect to the claims raised in Count IX, 55 Pa. Code § 3130.65 does not apply to voluntary safety plan and, therefore, it is not a violation of Section 3130.65 to extend a voluntary safety plan beyond thirty days without a court order or to not include notices of due process rights in the plan.  Thus, assuming that Franklin County had the above-described policies of extending voluntary safety plans beyond thirty days without a court order and of not including due process notices in the plans, such policies are not in violation of Pennsylvania law.  Thus, to the extent that Plaintiffs allege that these Franklin County policies violate Pennsylvania law, such claims are dismissed with prejudice.

Second, the Court must determine whether Franklin County's alleged policies of

extending voluntary safety plans beyond thirty days without court orders and not including due

process notices in the plans denied Plaintiffs due process.  After carefully reviewing Plaintiffs'

complaint and brief in opposition, the Court believes that Plaintiffs are contending that these

policies denied them due process on the bases that: (1) the December 20, 2010 voluntary safety

plan curtailed their parental rights, thereby triggering their due process rights – namely, the right

to a hearing – before they agreed to the actions specified in the plan;[15] and (2) their parental

rights were further curtailed because the actions outlined in the plan remained in effect for

approximately six months "without a court order or any court oversight."  (Doc. No. 1 ¶ 79-83;

Doc. No. 41 at 13-20.)  As discussed above, the issue of whether Mr. Billups and Ms. Rosario's

due process rights were impinged hinges on whether there were proper legal grounds to institute

the voluntary safety plan.  The Court has found that Plaintiffs have pled sufficient facts to

potentially demonstrate that there were not proper legal grounds.  Therefore, at this juncture, the

Court will deny the Franklin County Defendants' motion to dismiss these claims.

> b.    *Failure to Train*

Count VIII also alleges that Franklin County denied Plaintiffs due process and violated

Plaintiffs' Fourth Amendment rights by failing to properly train its employees: (1) "that

requiring a parent not to be alone with his children is a curtailment of the fundamental right of a

parent to the care, custody and control of his children;" (2) "that requiring a parent to [agree to]

unannounced and announced visits by [CYF] employees is a curtailment of the fundamental right

of a person to be secure in [his or her] home from warrantless government intrusion;" and (3)

---

[15] The Court notes that Plaintiffs also contend that the December 20, 2010 voluntary safety plan failed to include four statements mandated by 55 Pa. Code § 3130.65.  As discussed, Section 3130.65 does not apply to voluntary safety plans.  Therefore, the Court will not further consider this argument.

"about the procedural due process considerations of the use [of] coercive threats to remove children if parents [do not] agree to [voluntary safety plans] and/or [voluntary placement agreements] that curtail parental rights to the care[,] custody[,] and control of their children and the right to be secure in their home without warrantless government intrusion."  (Doc. No. 1 ¶ 202.)

A prima facie claim for failure to train requires plaintiffs to plead a "pattern of similar constitutional violations by untrained employees" which "demonstrate[s] deliberate indifference" to the rights of persons with whom the untrained employees come into contact. Connick, 131 S. Ct. at 1360.  Plaintiffs "must identify a failure to provide specific training that has a causal nexus with their injuries . . . ." Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).  The Supreme Court defines deliberate indifference as follows:

> [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.  The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

Connick, 131 S. Ct. at 1360 (internal quotations and citations omitted).

Regarding all three of the above allegations of failure to train, Plaintiffs have not pled a pattern of constitutional violations by untrained employees, or that Franklin County or its employees acted with the requisite deliberate indifference.  In order to avoid "collapse into respondeat superior," merely alleging that a single injury "could have been avoided if an employee had had better or more training" is insufficient to state a claim. Connick, 131 S. Ct. at

43

1363-65 (internal brackets omitted).  Instead, Plaintiffs must show that the need for the County

to provide specific training in order to avoid constitutional injury was "highly predictable" or

"patently obvious."  Id. at 1360; Brown, 520 U.S. at 409.  Plaintiffs' allegations do not meet this

standard.  Accordingly, the Court will dismiss the failure-to-train claims raised in Count VIII

without prejudice.

c.    <em>Injunctive Relief</em>

Plaintiffs further seek injunctive relief in Count VIII "to prevent Franklin County and

[CYF] from continuing to violate due process in the coercive use of 'voluntary' safety plans

against other families similarly situated."  (Doc. No. 1 ¶ 204.)  Neither Plaintiffs nor the Franklin

County Defendants have addressed this issue in their briefs.

As discussed with respect to Plaintiffs' request for injunctive relief in Count VII, in

Section 1983 cases, an "injunction is to be used sparingly, and only in a clear and plain case."

Rizzo, 423 U.S. at 378 (internal quotations omitted).  "[P]ast exposure to illegal conduct does

not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied

by continuing, present adverse effects."  Lyons, 461 U.S. at 102 (internal quotations omitted).  In

order to have standing under Article III of the United States Constitution, plaintiffs must show:

> (1) [they have] suffered an "injury in fact" that is (a) concrete and
> particularized and (b) actual or imminent, not conjectural or
> hypothetical;
>
> (2) the injury is fairly traceable to the challenged action of the
> defendant; and
>
> (3) it is likely, as opposed to merely speculative, that the injury will
> be redressed by a favorable decision.

Cortes, 622 F.3d at 228 (quoting Laidlaw, 528 U.S. at 180-81).

While Plaintiffs allege a future injury, that injury must be "certainly impending," not an injury that will only occur at "some indefinite future time." Cortes, 622 F.3d at 228 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 n.2 (1992)). The Supreme Court held in Lyons that the plaintiff's allegations that the police routinely apply chokeholds in situations where the police are not threatened by the use of deadly force, and that the police may stop the plaintiff in the future and apply a chokehold to him, fell short of the allegations that would be necessary to establish a case or controversy for Article III purposes. 461 U.S. at 105. Similarly, the allegations of Plaintiffs that other families may suffer injury due to Franklin County's alleged unconstitutional policies regarding voluntary safety plans do not establish a case or controversy. Plaintiffs lack standing to seek injunctive relief on behalf of other families. Accordingly, the Court will dismiss Plaintiffs' request for injunctive relief in Count VIII with prejudice.

4.      *Count IV: Claims Against Ms. Lay and Ms. Watson*

Count IV alleges a substantive due process claim against CYF employees Ms. Lay and Ms. Watson. As discussed with respect to Count II, Plaintiffs aver that the AAP has a policy of presuming that "the cause of any intracranial injury in a child under the age of one year is caused by abuse unless the parents provide an accidental explanation . . . ." (Id. ¶ 12.) Plaintiffs assert that Ms. Lay and Ms. Watson followed the CYS policy of relying upon doctors affiliated with the AAP or, alternatively, that they failed to conduct their own "independent medical non-presumption tainted burden shifting investigation." (Id. ¶ 140.)

As discussed with respect to Counts I, II, and IX, a government employee abridges a parent's substantive due process rights when she removes a child from her parents while consciously disregarding a great risk that there had been no abuse. Ziccardi, 288 F.3d at 66. The

focus for due process purposes is "whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference" with Mr. Billups and Ms. Rosario's parental rights.  Croft, 103 F.3d at 1126. "Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power."  Id.  For example, in Croft, the Third Circuit held that a county employee violated a father's substantive due process rights because she based her conclusion that the father had sexually abused his child on hearsay evidence and had not formed a personal opinion with respect to whether abuse had actually occurred.  Id. at 1127.

Here, Plaintiffs allege that Ms. Lay and Ms. Watson based their conclusion that L.B. had been abused completely on the medical conclusions of the Medical Center doctors who examined L.B's injuries.  Therefore, it is reasonable to infer from this allegation that Ms. Lay and Ms. Watson, like the county employee in Croft, did not form a personal opinion regarding whether Mr. Billups had abused L.B. before initiating dependency proceedings.  Ms. Lay and Ms. Watson, however, relied on the opinion of child abuse medical experts, not on an anonymous tip based on hearsay.  The complaint does not sufficiently plead that Ms. Lay and Ms. Watson consciously disregarded a great risk that L.B. had not been abused because they knew that the medical conclusions of the Medical Center doctors were "tainted."  Accordingly, the Court will grant the Franklin County Defendant's motion to dismiss Count IV of the complaint.

     5.     *Counts V and VI: Claims Against Chambersburg Borough, Detective Frisby, Franklin County District Attorney Fogel, and Franklin County Assistant District Attorney Lauren Sulcove*

Count V raises a substantive due process claim against Franklin County District Attorney

Fogel and Chambersburg Borough for adopting policies of: (1) relying on the AAP presumption that an intracranial injury in a child less than one year old is due to child abuse; (2) not conducting an independent medical investigation into whether child abuse has occurred; and (3) not training the medical experts upon whom they exclusively rely that a medical presumption that shifts the burden to parents to provide a non-abusive explanation for a child's injuries is unconstitutional.  The complaint alleges that these policies violated their "right to the presumption of innocence and due process during the investigation of whether the report of L.B.'s suspected child abuse was in fact, actually child abuse," and that, as a result of these policies, Mr. Billups faced criminal charges.  (Doc. No. 1 ¶¶ 147-48.)

In the alternative, Plaintiffs claim in Count VI that Chambersburg Borough and District Attorney Fogel do not have these policies and that Detective Frisby and Assistant District Attorney Sulcove, "with reckless indifference to the substantive due process rights of [Mr. Billups], failed to conduct or procure their own independent medical non-presumption tainted burden shifting investigation and relied exclusively upon [the medical opinions of ] Defendants Dias, Crowell and Choudhary."  (Id. ¶ 152.)  Plaintiffs allege that Detective Frisby's and Assistant District Attorney Sulcove's failure to conduct an independent investigation violated Mr. Billups's right to the presumption of innocence, an unbiased investigation, and due process during the investigation of L.B.'s injuries, and that, "[a]s a direct and proximate result," Mr. Billups faced criminal charges.  (Id. ¶ 153.)

The Chambersburg Borough Defendants principally contend that Plaintiffs fail to state claims upon which relief can be granted in Counts V and VI because the claims do not implicate the Fourteenth Amendment's guarantee of substantive due process, as "[t]he constitutionality of

arrests by state officials is governed by the Fourth Amendment rather than the due process

analysis." (Doc. No. 38 at 5-6.) Similarly, the Franklin County Defendants assert that the due

process analysis is not applicable to the claims raised in these counts because the "government

action [at issue] is controlled by a specific constitutional amendment." (Doc. No. 36 at 18.)

They also contend that District Attorney Fogel and Assistant District Attorney Sulcove are

entitled to prosecutorial immunity with respect to the complained-of actions. (Doc. No. 52 at 7-

8.) In opposition, Plaintiffs make a lengthy argument concerning the alleged controversy in the

medical field of shaken baby syndrome and, relatedly, pointing out the flaws in the medical

opinions of Drs. Dias, Crowell, and Choudhary regarding L.B.'s injuries. (See Doc. No. 46 at 4-

10.) Plaintiffs, however, do not respond to the contentions that the Fourteenth Amendment is not

applicable to the claims raised in Counts V and VI.

　　　As discussed with respect to Counts I and II, when analyzing a Fourteenth Amendment

substantive due process claim, this Court must be cognizant that "[w]here a particular

Amendment provides an explicit textual source of constitutional protection against a particular

sort of government behavior, that Amendment, not the mere generalized notion of substantive

due process must be the guide for analyzing these claims." Albright, 510 U.S. at 273 (internal

quotation marks omitted); Doe, 361 F.3d at 238 n.3. The Supreme Court explained that "[t]he

framers considered the matter of pretrial deprivations of liberty and drafted the Fourth

Amendment to address it," and that "[w]e have in the past noted the Fourth Amendment's

relevance to the deprivations of liberty that go hand in hand with criminal prosecutions."

Albright, 510 U.S. at 274. Thus, it is the Fourth Amendment, and not substantive due process,

that provides an explicit source of protection for the claims raised by Plaintiffs in Counts V and

VI.  Because Plaintiffs have not raised these claims pursuant to the Fourth Amendment or otherwise addressed this issue in a brief in opposition, the Court will dismiss the claims raised in Counts V and VI with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant the Medical Center Defendants' and the Chambersburg Borough Defendants' motions to dismiss.  (Doc. Nos. 32, 39.)  Further, the Court will grant in part and deny in part the Franklin County Defendants' motion to dismiss.  (Doc. No. 25.)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMEL BILLUPS, et al.,** | : | |
| **Plaintiffs** | : | |
| | : | **Civil Action No. 1:11-cv-01784** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **PENN STATE MILTON S. HERSHEY** | : | |
| **MEDICAL CENTER, et al.,** | : | |
| **Defendants** | : | |

**ORDER**

**AND NOW**, on this 23rd day of April 2012, **IT IS HEREBY ORDERED THAT** the

Penn State Milton S. Hershey Medical Center Defendants' motion to dismiss (Doc. No. 39) is

**GRANTED**, the Chambersburg Borough Defendants' motion to dismiss (Doc. No. 32) is

**GRANTED**, and the Franklin County Defendants' motion to dismiss (Doc. No. 25) is

**GRANTED IN PART AND DENIED IN PART** as follows:

1.     Plaintiffs' substantive due process claims raised in Counts I and II against Penn State Milton S. Hershey Medical Center and Drs. Dias, Crowell, and Choudhary are **DISMISSED WITH PREJUDICE** to the extent that they are based on Plaintiff Jamel Billups's incarceration and criminal prosecution.  In all other respects, these claims are **DISMISSED WITHOUT PREJUDICE**;

2.     Plaintiffs' substantive due process claims raised in Counts III and VIII against Franklin County Office of Children, Youth and Families are **DISMISSED WITH PREJUDICE**, and the Clerk of Court is directed to **TERMINATE** Franklin County Office of Children, Youth and Families from this action.

3.     Plaintiffs' substantive due process claim raised in Count IV against Tammie Lay and Dawn M. Watson is **DISMISSED WITHOUT PREJUDICE**;

4.     Plaintiffs' substantive due process claims raised in Counts V and VI against the Borough of Chambersburg, William C. Frisby, Jr., Franklin County District Attorney Matthew Fogel, and Franklin County Assistant District Attorney Lauren Sulcove raised in Counts V and VI are **DISMISSED WITH PREJUDICE**;

5.     Plaintiffs' ineffective assistance of counsel claim raised in Count VII against

Penn State Milton S. Hershey Medical Center and Dr. Eggli is **DISMISSED WITH PREJUDICE**;

6.     Plaintiffs' claims under the Fourth, Fifth, and Fourteenth Amendments and the Pennsylvania Constitution raised in Count VII against Penn State Milton S. Hershey Medical Center and Dr. Eggli are **DISMISSED WITHOUT PREJUDICE**;

7.     Plaintiffs' request for injunctive relief in Count VII is **DISMISSED WITH PREJUDICE** to the extent that it seeks relief on behalf of other individuals.  In all other respects, this request is **DISMISSED WITHOUT PREJUDICE**;

8.     Plaintiffs' state law claims and request for injunctive relief raised in Count VIII against Franklin County is **DISMISSED WITH PREJUDICE**;

9.     Plaintiffs' failure-to-train claim raised in Count VIII against Franklin County is **DISMISSED WITHOUT PREJUDICE**;

10.    Plaintiffs' state law claims raised in Count IX against Kari Coccagna and Minnie Tuner are **DISMISSED WITH PREJUDICE**; and

11.    The Franklin County Defendants' motion to dismiss the substantive due process claims raised in Count VIII against Franklin County and the substantive due process claims raised in Count IX against Kari Coccagna and Minnie Tuner is **DENIED**.

**IT IS FURTHER ORDERED THAT** Plaintiffs are granted leave to file an amended

complaint within twenty days of the date of this order.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania