**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JAMEL BILLUPS, <u>et</u> <u>al.</u>,      :
      Plaintiffs          :
                         :    **Civil Action No. 1:11-cv-01784**
v.                      :
                         :    **(Chief Judge Kane)**
PENN STATE MILTON S. HERSHEY    :
MEDICAL CENTER, <u>et</u> <u>al.</u>,      :
      Defendants         :

<u>MEMORANDUM</u>

Presently pending before the Court are two motions to dismiss Plaintiffs' amended complaint filed by the Penn State Milton S. Hershey Medical Center Defendants (Doc. No. 61) and the Franklin County Defendants (Doc. No. 60). The motions have been fully briefed and are ripe for disposition. For the reasons stated more fully herein, the Court will grant the Franklin County Defendants' motion and will grant in part and deny in part the Penn State Milton S. Hershey Medical Center Defendants' motion.

I.    **BACKGROUND**

A.    **Parties and Procedural Background**

Plaintiffs Jamel Billups and Jacqueline Rosario, and their daughters, L.B. and T.R., both minors, filed a nine-count complaint in this matter on September 27, 2011. (Doc. No. 1.) Their complaint targeted three groups of Defendants, and each group moved to dismiss the complaint. (Doc. Nos. 25, 32, 39.) On April 23, 2012, the Court issued a memorandum and order granting the motions filed by the Chambersburg Borough Defendants and the Penn State Milton S. Hershey Medical Center Defendants, granting in part and denying in part the Franklin County Defendants' motion, and granting Plaintiffs leave to file an amended complaint. (Doc. No. 58.)

Plaintiffs filed an amended complaint on May 13, 2012. (Doc. No. 59.) The amended complaint arises from the circumstances surrounding the temporary removal of L.B. and T.R. from the custody of Mr. Billups and Ms. Rosario and alleges that the Penn State Milton S. Hershey Medical Center Defendants and the Franklin County Defendants violated Plaintiffs' constitutional rights. The Penn State Milton S. Hershey Medical Center Defendants are comprised of the Penn State Milton S. Hershey Medical Center ("Medical Center") and four Medical Center employees – Mark S. Dias, M.D., who is a neurosurgeon and co-director of the Medical Center's Child Safety Team; Kathryn R. Crowell, M.D., who is a co-director of the Child Safety Team; Arabinda K. Choudhary, M.D., who is the director of the pediatric neuroradiology department and a member of the Child Safety Team; and Kathleen D. Eggli, M.D., who is the chair of the radiology department. The Franklin County Defendants are comprised of Franklin County and two employees of the Franklin County Office of Children, Youth, and Families ("CYF") – Kari Coccagna and Minnie Tuner.

### B.    Factual Background[1]

This case arises out of a child abuse investigation that resulted in Mr. Billups and Ms. Rosario temporarily losing custody of their daughters, T.R. and L.B, and also resulted in Mr. Billups being criminally prosecuted in state court. At the time of the events giving rise to Plaintiffs' claims, T.R. was approximately two years old and L.B. was approximately four months old. (Doc. No. 51 ¶ 16.)

---

[1] In stating the relevant facts, the Court must accept Plaintiffs' factual allegations as true and will "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004). Accordingly, in describing various medical conditions and examinations, the Court will rely solely on the allegations of Plaintiffs' amended complaint.

On October 19, 2009, while Ms. Rosario was at work, Mr. Billups watched over T.R. and L.B. in the apartment he shared with Ms. Rosario.  (Id. ¶ 17.)  After hearing L.B. cry, Mr. Billups checked on her and noticed that she was arching her back and "tens[ing] up."  (Id. ¶¶ 17-18.)  He proceeded to carry her to the living room, where he noticed that she was stretching her arms out rigidly and having difficulty breathing.  (Id. ¶ 17.)  He then called Ms. Rosario, who was already en route to the apartment.  (Id.)  After Ms. Rosario arrived home, she and Mr. Billups called 911 to seek medical attention for L.B.  (Id.)  After doing so, however, they decided to take L.B. to the Chambersburg Hospital themselves, so that L.B. could receive medical attention faster.  (Id.)

After L.B. was admitted to the Chambersburg Hospital, a computed tomography ("CT") scan of L.B. was performed at approximately 5:31 p.m.  (Id. ¶ 20.)  The CT scan revealed that L.B. had a "small amount of subdural and subarachnoid hemorrhage and edema."  (Id.)  The examination did not reveal a "soft tissue swelling or [a] skull fracture."  (Id.)

*1.    L.B.'s Transfer to, and Examinations at, the Medical Center*

At approximately 7:37 p.m. on October 19, 2009, L.B. was admitted to the Medical Center.  (Id. ¶ 21.)  Plaintiffs aver that L.B. was transferred to the Medical Center "because, according to the Chambersburg [Hospital] emergency room note, L.B.'s 'intracranial hemorrhage and bilateral healed/healing rib fractures' were 'suspicious of nonaccidental trauma' and [the Medical Center] had a Child Safety Team."  (Id.)  The following day, at approximately 4:29 p.m., magnetic resonance imaging ("MRI") and magnetic resonance venography ("MRV") examinations of L.B. were performed.  (Id. ¶ 22.)  These examinations revealed that L.B. had thrombosis, a condition – otherwise known as a childhood stroke – in which "one or more veins

that drain blood from . . . [the] brain [are] clotted." (Id.) The examination also revealed that one of L.B.'s veins was dilated and that there was a non-specific signal in L.B.'s neck, both of which represented an increase in blood flow "as a result of L.B.'s brain finding alternative pathways to compensate for the clotted veins in her brain." (Id.) No evidence of injury to L.B.'s spine or of disruption to her spinal ligaments was detected. (Id.)

Dr. Choudhary, the director of pediatric neuroradiology at the Medical Center and a member of its Child Safety Team, evaluated the results of this examination and recorded his conclusions in a report. (Id. ¶¶ 10, 23.) The Child Safety Team, co-directed by Drs. Dias and Crowell, evaluates patients whose injuries indicate that they may be victims of child abuse. (Id. ¶¶ 7-9.) In his report, Dr. Choudhary stated that the "'superficial cortical vessels on the left side [of L.B.'s brain] are not visualized' and that thrombosis was a possible explanation." (Id. ¶ 23.)

In addition, an abdominal CT scan and skeletal surveys of L.B. were performed at the Medical Center. (Id. ¶ 29.) The CT scan and skeletal surveys revealed that L.B. had sixteen bilateral rib fractures in the anterior region of her ribs, none of which were acute and all of which were approximately four-to-eight weeks old. (Id.) Neither the CT scan nor the skeletal surveys revealed that L.B. had suffered any internal injuries associated with the rib fractures. (Id.)

On October 22, 2009, a Medical Center radiologist reported that L.B.'s rib fractures "were 'at the anterior anxillary line' and the 'lateral aspect and anterior anxillary line.'"[2] (Id. ¶ 42.) According to Plaintiffs, posterior rib fractures "have been considered by proponents of the

---

[2] Plaintiffs do not identify the radiologist who made this report, but they aver elsewhere in the amended complaint that "[t]he report of the skeletal survey of L.B. which identified none of L.B.'s rib fractures as being posterior was authored by Dr. Danielle Boal." (Doc. No. 59 ¶ 29.)

shaken baby syndrome hypothesis as pathognomonic, or having a virtual 100% predictive diagnostic value, of the diagnosis of abuse." (Id. ¶ 43.)

On October 28, 2009, Dr. Crowell issued a medical report wherein she concluded that L.B.'s injuries were caused by abuse. (Id. ¶ 36.) Neither Dr. Crowell nor any other doctor, however, performed tests to exclude non-traumatic explanations for L.B.'s injuries, such as "a thrombophilia workup." (Id. ¶¶ 24, 33-34.) Further, no doctor at the Medical Center asked Ms. Rosario whether she suffered from a Vitamin D deficiency or conducted tests to determine whether Ms. Rosario or L.B. suffered from such a deficiency. (Id. ¶ 34.) Plaintiffs allege that a Vitamin D deficiency "can lead to rickets, a condition known to flare the anterior ends of a child's ribs sometimes appearing as if they were healing fractures and sometimes referred to as a rachitic rosary" and "can also lead to weak bones that fracture with birth and/or normal infant handling." (Id. ¶ 30.)

### 2. Dependency Proceedings

On October 20, 2009, the day after L.B. was admitted to the Medical Center and "presumably before the results of the October 20, 2009 MRI .. . [were] known," Franklin County obtained an ex parte order, granting temporary custody of T.R. and L.B. to the County. (Id. ¶ 25.) Also on that date, the "Franklin County clerk of courts docketed a dependency petition seeking the custody of T.R. and L.B. and seeking appointment for an attorney for [Ms. Rosario]. The court also ordered a psychological evaluation of [Mr. Billups and Ms. Rosario]." (Id. ¶ 26.) According to the dependency petition, Franklin County employees, "following an emergency administrative staffing, . . . determined Court intervention was also necessary in order to ensure the continued safety and well being of [L.B.]." (Id. ¶ 27.) Plaintiffs aver that Franklin County

employees "would have consulted with L.B.'s treating physician and/or a member of the Child Safety Team" before filing the petition. (<u>Id.</u> ¶ 28.)

The Franklin County Court of Common Pleas held a dependency hearing on December 18, 2009. (<u>Id.</u> ¶ 41.) At the hearing, Dr. Crowell, who was qualified as an expert witness in the area of child abuse, testified that "an extensive screening" of L.B. was performed to determine whether she had coagulation problems, bleeding disorders, or an abnormal "metabolic workup." (<u>Id.</u>) With respect to L.B.'s rib fractures, Dr. Crowell testified that a radiologist indicated that the fractures were posterior, not anterior. (<u>Id.</u> ¶ 42.) Plaintiffs, however, allege that no radiologist ever made this finding. (<u>Id.</u>) Dr. Crowell was also questioned about an October 22, 2009 report, which stated that L.B.'s rib fractures were at the anterior anxillary line. (<u>Id.</u> ¶ 44.) Dr. Crowell explained that the reference to the anterior anxillary line in that report indicated the location from which the fractures were viewed, not that the fractures were anterior. (<u>Id.</u>)

At the conclusion of the hearing, the court, having determined that the allegations of abuse had been sustained, adjudicated both L.B. and T.R. dependent. (<u>Id.</u> ¶ 49.) The court reasoned that L.B.'s parents had failed to offer a plausible alternative explanation for L.B.'s injuries and found that, in light of the examinations performed on L.B. at the Medical Center, "it is highly unlikely that any credible expert could have come to a different conclusion at all different than that at which Dr. Crowell arrived." (<u>Id.</u> ¶ 49.) Further, the court stated that "testimony from a retained expert would not have had a high degree of likelihood of changing the result in this case, since the evidence in favor of dependency came from a treating physician and was so credible and overwhelming." (<u>Id.</u>) Plaintiffs, however, assert that Dr. Crowell was never L.B.'s treating physician. (<u>Id.</u> ¶ 50.)

3.                Contrary Expert Reports Regarding L.B.'s Injuries

In January 2010, Ms. Rosario obtained replacement counsel and retained Dr. Julie Mack, an assistant professor of radiology at Penn State, and Dr. Barnes, the director of the Pediatric MRI & CT Center at the Stanford University Medical Center's Lucile Packard Children's Hospital, to evaluate the opinions of Drs. Crowell, Dias, and Choudhary regarding L.B.'s injuries.  (Id. ¶¶ 52-54.)  At this time or sometime thereafter in 2010, Dr. Eggli, the chair of the Medical Center's radiology department, implemented a department policy authorizing her to either approve or not approve the reports of Medical Center doctors in legal proceedings, deny liability insurance to those doctors whose reports were not approved, and prohibit those doctors whose reports were not approved from revealing their position at the Medical Center or using the Medical Center logo and letterhead when creating reports.  (Id. ¶ 11.)

On February 14, 2010, Dr. Barnes issued a report, concluding that L.B.'s rib fractures were anterior, that thrombosis and congenital rickets were possible causes of L.B.'s injuries, that a more thorough "hematology/coagulopathy and vascular workup" should be performed on L.B., and that a "bone fragility disorder" should be considered and evaluated.  (Id. ¶ 57.)  Dr. Barnes sent his report to Franklin County.  (Id.)  Upon Dr. Mack's review of Dr. Barnes's report and the Medical Center's findings, she was concerned that the Medical Center's Child Safety Team "had mistakenly concluded that L.B.'s thrombosis and congenital rickets were caused by abuse."  (Id. ¶ 59.)  Plaintiffs aver that Dr. Mack then contacted Drs. Crowell, Choudhary, and Mark Iantasco, who was L.B.'s attending physician, to explain why she believed that L.B.'s injuries were not due to abuse.  (Id.)  Although Dr. Mack's request to discuss the case was allegedly not well received, Dr. Crowell did invite Dr. Mack to present her findings to the Child Safety Team.  (Id.

¶¶ 59-60.)

4.    *Transfer of Custody and Further Reports Regarding L.B.'s Injuries*

On February 15, 2010, physical custody of L.B. and T.R. was returned to Ms. Rosario. (Id. ¶ 58.)  Franklin County, however, retained legal custody of the children.  (Id.)  About two weeks later, Ms. Rosario, upon the request of Dr. Mack, was tested for deficiency of vitamins D2 and D3.  (Id. ¶ 61.)  Results of these tests revealed that Ms. Rosario's vitamin D2 level was nearly nonexistent and that her vitamin D3 level was severely deficient, indicating that the risk of L.B. suffering from congenital rickets was high.  (Id.)  Around this time, Dr. Barnes also determined that there was evidence of congenital rickets on L.B.'s skeletal x-rays.  (Id.)  On March 9, 2010, further blood tests were performed on L.B., revealing that she had a low protein S level, a risk factor for abnormal blood clotting and thrombosis.  (Id. ¶ 62.)

On March 10, 2010, Plaintiffs' counsel sent Dr. Crowell a letter, informing her that she had testified falsely regarding the location of L.B.'s rib fractures and the number of tests that had been performed on L.B. to determine if her injuries were not due to abuse.  (Id. ¶ 63.)  In the letter, which counsel also sent to Franklin County, counsel urged Dr. Crowell to inform the Franklin County Court of Common Pleas of her false testimony.  (Id.)  After receiving this letter, Dr. Crowell withdrew her invitation to Dr. Mack to present her findings to the Child Safety Team, citing "risk management" as the reason for the revocation.  (Id. ¶¶ 65-66.)

On April 5, 2010, the Franklin County Court of Common Pleas terminated its order of dependency, and legal custody of L.B. and T.R. was returned to Ms. Rosario.  (Id. ¶ 67.)  On April 29, 2010, the court ordered Franklin County Assistant District Attorney Lauren Sulcove to provide Mr. Billups's counsel with an expert report from Dr. Dias.  (Id. ¶ 68.)  On June 15, 2010,

Dr. Dias sent a report, created on Medical Center letterhead and including the Medical Center logo, to Assistant District Attorney Sulcove. (Id. ¶ 71.) In his report, Dr. Dias did not address L.B.'s low protein S level or Ms. Rosario's vitamin D deficiencies. (Id. ¶ 72.) After receiving the report, Assistant District Attorney Sulcove informed the court that she would call Dr. Dias as an expert witness at Mr. Billups's trial. (Id. ¶ 71.)

On July 2, 2010, Dr. Mack created a report in which she concluded that thrombosis caused L.B.'s intracranial bleeding, that L.B.'s vitamin D levels could not have been higher than Ms. Rosario's at birth, and that the presence of a large number of asymptomatic rib fractures is indicative of an underlying bony mineralization disorder. (Id. ¶ 73.) Mr. Billups's counsel obtained additional medical reports, positing that L.B.'s injuries were not due to abuse, from Drs. Joseph Scheller, David Ayoub, and Holmes Morton. (Id. ¶¶ 69, 74-75.)

### 5. Criminal Proceedings

On October 29, 2009, Chambersburg Borough Detective William C. Frisby, Jr. created an affidavit of probable cause based entirely on the conclusions of Dr. Crowell recorded in her October 28, 2009 report regarding L.B.'s injuries. (Id. ¶ 38.) The affidavit charged Mr. Billups with aggravated assault and endangering the welfare of a child. (Id.) Later that day, Mr. Billups voluntarily reported to the Chambersburg Borough police station and was taken into custody. (Id. ¶ 39.) Bail was set at $200,000. (Id.) Mr. Billups remained in jail until December 17, 2010, on which date a jury found him not guilty of the charges. (Id.)

After the December 18, 2009 dependency hearing, the Franklin County District Attorney decided to pursue the criminal charges against Mr. Billups. (Id. ¶ 45.) A preliminary criminal hearing was held on December 28, 2009. (Id.) At the hearing, Dr. Crowell was qualified as an

expert in the area of child abuse, and she testified that she was an assistant professor of pediatrics at Penn State. (Id.) She further testified that an extensive screening for coagulation problems and bleeding disorders, as well as a MRI examination, were performed and that no evidence of a bleeding problem or an arterial venous malformation was detected.[3] (Id. ¶ 46.)

Mr. Billups's criminal trial began on December 13, 2010. (Id. ¶ 76.) During the trial, Drs. Choudhary, Crowell, and Dias testified regarding L.B.'s injuries. (Id. ¶¶ 76, 229-31.) Dr. Crowell testified that she had misrepresented the location of L.B.'s rib fractures when she testified at the dependency and preliminary criminal hearings. (Id. ¶ 76.) She also testified that, upon learning of her error, she conferred with an attorney for the Medical Center, who told her that a letter would be sent to counsel for Mr. Billups and the Franklin County Court of Common Pleas to inform them of the error. (Id.) Thereafter, Mr. Billups's counsel requested a copy of this letter. (Id. ¶ 78.) In response, Attorney April C. Simpson, counsel for Dr. Crowell, stated that a letter had been prepared on behalf of Dr. Crowell but had not been mailed due to an oversight not attributable to Dr. Crowell. (Id. ¶ 79.)

Dr. Mack also testified on Mr. Billups's behalf at the trial. (Id. ¶ 232.) According to Plaintiffs, because of the expert witness policy promulgated by the Medical Center and Dr. Eggli, Dr. Mack – unlike Drs. Crowell, Choudhary, and Dias – was not able to testify that she was an assistant professor of radiology at Penn State and was not covered by the Medical Center's liability insurance policy. (Id. ¶¶ 11, 229-32.) Plaintiffs' amended complaint does not

---

[3] In the amended complaint, Plaintiffs allege that Dr. Dias reported findings regarding L.B.'s injuries that contradicted Dr. Crowell's testimony at the December 28, 2009 preliminary criminal hearing. They further aver that Dr. Choudhary, after conferring with Dr. Dias, altered his findings with respect to L.B.'s injuries. Plaintiffs, however, do not aver whether Drs. Dias and Choudhary reached these conclusions before or after the December 28, 2009 hearing.

contain facts indicating the content of Dr. Mack's testimony, but, as noted, it does contain allegations that her opinions differed from those of Drs Crowell, Choudhary, and Dias. (Id. ¶ 11.)

On December 17, 2010, a jury found Mr. Billups not guilty of the criminal charges brought against him, and he was released from jail. (Id. ¶¶ 81-82.)

## II.     STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In reviewing a motion to dismiss, a court may "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum, 361 F.3d at 221 n.3. The motion will only be properly granted when, taking all factual allegations and inferences drawn therefrom as true, the moving party is entitled to judgment as a matter of law. Markowitz v. Ne. Land Co., 906 F.2d 100, 103 (3d Cir. 1990). The burden is on the moving party to show that no claim has been stated. Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980). Thus, the moving party must show that Plaintiff has failed to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that those elements exist." Kost, 1 F.3d at 183 (citations omitted). A court, however, "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Indeed, the United States Supreme Court has held that while the 12(b)(6) standard does not require "detailed factual allegations," there must be a "'showing,' rather than a blanket assertion of an entitlement to relief . . . . [F]actual allegations must be enough to raise a right to relief above the speculative level.'" Phillips v. Cnty. of

Allegheny, 515 F.3d 224, 231-32 (3d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Put otherwise, a civil complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)).

## III.    DISCUSSION

The Medical Center Defendants move to dismiss all claims Plaintiffs raise against them in the amended complaint, and the Franklin County Defendants move only to dismiss Count III of the amended complaint.  The Court will first address the Medical Center Defendants' motion to dismiss and then address the Franklin County Defendants' motion.

### A.    The Medical Center Defendants' Motion to Dismiss

The Medical Center Defendants are comprised of five individual Defendants: the Medical Center and Drs. Dias, Crowell, Choudhary, and Eggli.  They urge the Court to dismiss the claims raised against them in Counts I-A, I-B, II-A, II-B, II-C, and VII of the amended complaint and advance three arguments in support: (1) Plaintiffs have failed to plead sufficient facts to establish that the Medical Center Defendants are state actors; (2) Plaintiffs have failed to plead facts to sufficiently state any claim; and (3) the Medical Center Defendants are immune from liability. The Court will address each argument in turn.

#### 1.    State Action

To state claims under 42 U.S.C. § 1983, Plaintiffs must allege that the Medical Center Defendants were persons acting under color of state law when they deprived Plaintiffs of their constitutional rights.  West v. Atkins, 487 U.S. 42, 48 (1988).  "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under

the Fourteenth Amendment." United States v. Price, 383 U.S. 787, 794 n.7 (1966); see also

Robison v. Canterbury Vill., Inc., 848 F.2d 424 (3d Cir. 1988). Thus, "[t]he ultimate issue in

determining whether a person is subject to suit under § 1983 is the same question posed in cases

arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly

attributable to the State?" Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982). "What is fairly

attributable is a matter of normative judgment, and the criteria lack rigid simplicity . . . no one

fact can function as a necessary condition across the board for finding state action[.]"

Brentwood Acad. v. Tenn. Secondary Sch., 531 U.S. 288, 295 (2001). The Third Circuit has

articulated three tests that can be used to determine whether state action exists:

> (1) whether the private entity has exercised powers that are
> traditionally the exclusive prerogative of the state; (2) whether the
> private party has acted with the help of or in concert with state
> officials; and (3) whether 'the [s]tate has so far insinuated itself into
> a position of interdependence with the acting party that it must be
> recognized as a joint participant in the challenged activity. Under
> any test, the inquiry is fact-specific.

Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009) (internal brackets, citations, and quotation marks

omitted).[4]

---

[4] Plaintiffs repeatedly allege in their amended complaint and brief in opposition that the
Medical Center is wholly owned by the Pennsylvania State University and, as a result, is a state
actor. (Doc. No. 59 ¶ 7; Doc. No. 70 at 20-21.) In support of this argument, Plaintiffs contend
that the Medical Center "has confirmed that status by stating in another case that [the Penn State
University Milton S. Hershey College of Medicine] is 'an operating division of Penn State' to
this Court." (Doc. No. 70 at 21.) The Court, however, "may not take judicial notice of
proceedings or records in another case so as to supply, without formal introduction of evidence,
facts essential to support a contention in a cause before them." M/V Am. Queen v. San Diego
Marine Constr. Corp., 708 F.2d 1483, 1491 (9th Cir. 1983); see also Rickett v. Jones, 901 F.2d
1058, 1062 n.5 (11th Cir. 1990) ("In deciding this case, it seems best to stick to the record in this
case; we ought to take no notice of evidence in other cases to supply facts essential to support an
outcome in the present case."). Accordingly, the Court will disregard Plaintiffs' arguments
based on assertions made in another case and – because Plaintiffs have alleged other facts

The Court finds that Plaintiffs have alleged facts sufficient to establish a reasonable likelihood that Drs. Choudhary, Crowell, and Dias, by virtue of their role in investigating L.B.'s injuries, will qualify as state actors under the third test articulated in <u>Kach</u>. Under this test, "state action will be found if there is a sufficiently close nexus between the state and the <u>challenged</u> action of the regulated entity so that the action may be fairly treated as that of the State itself." <u>Boyle v. Governor's Veterans Outreach & Assistance Ctr.</u>, 925 F.2d 71, 76 (3d Cir. 1991) (emphasis in original and internal citations and quotation marks omitted). "The State will be held responsible for a private decision only when it has <u>exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State</u>." <u>Kach</u>, 589 F.3d at 648 (emphasis in original). Here, the amended complaint contains allegations that L.B. was in the custody of Franklin County before the Medical Center Defendants had concluded their examinations of L.B. (Doc. No. 59 ¶ 25.) The amended complaint further alleges that Drs. Choudhary, Crowell, and Dias, in their capacity as members of the Medical Center's Child Safety Team, do not provide medical care to patients but, rather, "conduct an investigation into, and render a conclusion about, whether suspected child abuse is, in fact, actual child abuse." (<u>Id.</u> ¶ 102.) Thus, the Child Safety Team, according to Plaintiffs, assists government agencies in investigating child abuse. (<u>Id.</u> ¶¶ 102, 106.)

Accepting Plaintiffs' allegations as true, the examinations of L.B. were not conducted for the purpose of treating her injuries but, rather, for the purpose of determining whether her injuries were the result of criminal activity. At this juncture, these allegations support a finding

_____

sufficient to establish state action at this stage of the litigation – will not further address these allegations.

of state action and are sufficient to withstand a motion to dismiss. See Kia P. v. McIntyre, 235 F.3d 749, 756 (2d Cir. 2000) (holding that where a private hospital acts "as part of the reporting and enforcement machinery for . . . a government agency charged with detection and prevention of child abuse and neglect," the hospital is a state actor); Mohil v. Glick, No. 07-cv-1600, 2012 WL 288613, at * (N.D. Ill. Feb. 1, 2012) (noting that where medical professionals who examine injuries in cases of suspected child abuse "are not themselves governmental employees, it is . . . beyond dispute that the interrelationship between those professionals and the purely governmental people involving in the decisionmaking process is truly a close entwinement"); Estiverne v. Esernio-Jenssen, 518 F. Supp. 2d 335, 345 (E.D.N.Y. 2008) (finding that allegations that a doctor employed by a private hospital, after suspecting a child had been abused, cancelled a MRI examination and commenced an investigation of the child's injuries were sufficient to allege state action because "[a]t this point, Medical Defendants began acting in their role as an instrumentality of the government by holding [the child] as part of the State's effort to detect and prevent child abuse") (internal quotation marks omitted).

2.     *Counts I-A and II-A: Substantive Due Process Claims Against the Medical Center and Drs. Choudhary, Crowell, and Dias*

Counts I-A and II-A of Plaintiffs' amended complaint raise substantive due process claims against the Medical Center and Drs. Choudhary, Crowell, and Dias. As in their original complaint, Plaintiffs essentially assert that these Defendants should be held liable because they failed to consider non-traumatic explanations for – and made misrepresentations regarding – L.B.'s injuries, which resulted in subsequent constitutional violations committed by the Franklin County Defendants.

The Court explained the standard for Plaintiffs' substantive due process claims in its

April 23, 2012 memorandum:

"The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" Baker v. McCollan, 443 U.S. 137, 140 (1979). The Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, cl. 1. The Supreme Court has stated that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66 (2000); see also Miller v. City of Phila., 174 F.3d 368, 374 (3d Cir. 1999). This right, however, is not absolute. Croft v. Westmoreland Cnty. Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997). "Indeed, this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children – particularly where the children need to be protected from their own parents." Id. In other words, "[t]he right to familial integrity . . . does not include a right to remain free from child abuse investigations." Id.

To prevail on a substantive due process claim premised on the unwarranted infringement of familial rights, parents must demonstrate that the government action at issue was so egregious or ill conceived that it "shocks the conscience." Miller, 174 F.3d at 375; see also Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008). This "conscience-shocking" standard is not satisfied by demonstrating that the government action was merely negligent. Miller, 174 F.3d at 375. Rather, the government action must "exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Id. at 375-76. In assessing this issue, the "fundamental liberty interests of the family unit" must be balanced against "the compelling interests of the state in protecting children from abuse." Croft, 103 F.3d at 1125. "[D]isruption or disintegration of family life" due to a child abuse investigation "does not, in and of itself, constitute a constitutional deprivation." Id. at 1125-26. In fact, a government actor may constitutionally override parents' rights to the care, custody, and control of their children if he or she possesses "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id. at 1126. When a government actor possesses such evidence, his or her removal of a child from the parents' custody does not infringe on the parent's rights, even if evidence produced during the course of an

investigation demonstrates that no abuse occurred. <u>Id.</u> To the contrary, a government actor infringes on the parents' rights by removing a child from their custody if he or she "consciously disregard[s] a great risk that there had been no abuse." <u>Ziccardi v. City of Phila.</u>, 288 F.3d 57, 66 (3d Cir. 2002) (citing <u>Miller</u>, 174 F.3d at 375).

(Doc. No. 58 at 15-16.)

### a.    Count I-A

The substantive due process claim Plaintiffs raise in Count I-A is premised on two alleged failures of Drs. Choudhary, Crowell, and Dias. First, Plaintiffs challenge these Defendants' failure to conduct further examinations of L.B. to determine if her injuries were not caused by abuse. (Doc. No. 59 ¶¶ 91, 114.) Second, Plaintiffs challenge these Defendants' representations that they had considered, and rejected, thrombosis and metabolic bone disease as causes of L.B. injuries even though they failed to conduct a "thrombophilia workup or vitamin D testing" on L.B. and Ms. Rosario, testing which would have been necessary to reach such a conclusion. (<u>Id.</u> ¶ 96.) In Plaintiffs' view, these failures demonstrate a conscious disregard of a great risk that L.B. had not been abused because the Defendants "knew, or should have known that based on their conclusion Franklin County and/or its employees would take steps to impair [Mr. Billups's and Ms. Rosario's] fundamental right to the custody of L.B. and T.R. and file indicated reports of abuse with Childline." (<u>Id.</u> ¶¶ 91, 96, 124.)

With respect to their claim that the Medical Center Defendants denied Plaintiffs substantive due process by failing to consider other causes of L.B.'s injuries, Plaintiffs ask the Court to conclude that parents sufficiently state a substantive due process claim where they allege that medical professionals, upon conducting examinations of their child's injuries, rendered an opinion that the child had been abused but were not absolutely certain of that

opinion's accuracy. (Doc. No. 70-12.) In other words, Plaintiffs request the Court to find that a substantive due process claim is sufficiently stated where medical professionals determine that abuse occurred, but subsequent investigations indicate that abuse may not have occurred. The Court declines to do so. The Third Circuit has held that government actors may constitutionally override parents' rights to the care, custody, and control of their children if they possess "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Croft, 103 F.3d at 1126. Further, when they possess such evidence, removal of the child from the parents' custody does not infringe on parental rights, "even if evidence produced during the course of an investigation demonstrates that no abused occurred." Id. Although Plaintiffs repeatedly allege that there was no evidence that L.B. sustained external injuries, their amended complaint contains allegations that Chambersburg Hospital personnel concluded that she sustained an intracranial hemorrhage and bilateral rib fractures, that MRI and MRV examinations revealed that at least one vein that drained blood from her brain had been clotted, and that a CT scan revealed that she sustained sixteen rib fractures. (Doc. No. 59 ¶¶ 19, 21-22, 29, 90-91, 114.) In the April 23, 2012 memorandum, the Court found that these allegations did not support the conclusion that the Medical Center Defendants lacked reasonable and articulable evidence of abuse or consciously disregarded a great risk that no abuse had occurred. (Doc. No. 58 at 19.) Here, Plaintiffs have essentially raised the same allegations, prompting the Court to reach the same conclusion: Plaintiffs cannot state a substantive due process claim based on allegations that the Medical Center Defendants failed to conduct further examinations of L.B.'s injuries. Accordingly, the Court will dismiss this portion of Count I-A with prejudice.

Regarding their claim that the Medical Center Defendants denied Plaintiffs substantive due process by misrepresenting that they had considered non-traumatic causes of L.B.'s injuries, the Court finds that Plaintiffs have sufficiently stated a substantive due process claim to survive a motion to dismiss. As discussed, Plaintiffs' amended complaint sufficiently alleges that Drs. Choudhary, Crowell, and Dias were state actors. Further, Plaintiffs allege that these Defendants represented that they had considered and rejected other bases for L.B.'s injuries, when they had not conducted the necessary testing to reach such conclusions, to individuals possessing the authority to remove L.B. and T.R. from their parents' custody and to institute criminal charges against Mr. Billups. These factual allegations are sufficient to make out a claim that these Defendants consciously disregarded a great risk that L.B. had not been abused. Accordingly, the Court will deny the Medical Center Defendants' motion to dismiss this portion of Count I-A. The Court, however, will grant the motion to dismiss this portion of Count I-A to the extent that the claim is raised against the Medical Center because the amended complaint is devoid of allegations that any misrepresentations were made pursuant to an official Medical Center policy. See, e.g., Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978).

*b.*     *Count II-A*

Count II-A raises a substantive due process claim against all of the Medical Center Defendants, except for Dr. Eggli, premised on their adoption of a medical presumption promulgated by the American Academy of Pediatrics, of which Drs. Choudhary, Crowell, and Dias are allegedly affiliates. (Doc. No. 59 ¶¶ 135, 163.) According to Plaintiffs, in 2001, the American Academy of Pediatric's Committee on Child Abuse and Neglect issued the following statement regarding shaken baby syndrome: "Although physical abuse in the past has been a

diagnosis of exclusion, data regarding the nature and frequency of head trauma consistently support the need for a presumption of child abuse when a child younger than 1 year has suffered an intracranial injury." (Id. ¶ 136.) Plaintiffs further aver that the Committee on Child Abuse and Neglect issued new data in 2009, but the American Academy of Pediatrics has not retracted its presumption. (Id. ¶ 137.) They also allege that Dr. Dias stated that the presumption "was operative during the investigation of L.B.'s suspected abuse." (Id. ¶ 140.)

Although Plaintiffs recognize that there is no presumption of innocence in a child abuse investigation, they allege that "due process of law mandates that the burden of proof rest upon the government in the administrative act of filing Childline reports and in the administrative act of investigating reports of suspected child abuse." (Id. ¶ 144.) In essence, they make five allegations in support of Count II-A: (1) Drs. Dias, Crowell, and Choudhary's involvement with the American Academy of Pediatrics, and their actions in prior cases, indicate that they have adopted and applied the presumption; (2) by adopting the presumption, they "believe[d] that they [did] not have to actually perform testing to rule out" non-traumatic explanations for L.B.'s injuries and prematurely concluded that L.B.'s injuries were not attributable to non-traumatic causes; (3) this premature conclusion shifted the burden to Mr. Billups and Ms. Rosario "to provide a non-accidental explanation for the trauma;" (4) after Mr. Billups and Ms. Rosario informed Dr. Crowell that L.B. did not have a medical history of trauma and had not suffered an "accidental trauma," she and Drs. Dias and Choudhary applied the presumption and concluded that L.B.'s injuries were due to abuse; and (5) the Franklin County Defendants relied on Drs. Dias, Crowell, and Choudhary's conclusions, which resulted in Mr. Billups and Ms. Rosario losing custody of T.R. and L.B., defending a dependency petition, and being listed as

perpetrators of child abuse.  (Id. ¶¶ 146, 152-53, 157-58, 163-64, 168-73.)

Even accepting Plaintiffs' allegations that the Medical Center Defendants adopted and applied the medical presumption as true, Plaintiffs have failed to sufficiently state a substantive due process claim based on these actions.  Plaintiffs' amended complaint and brief in opposition repeatedly highlight the problematic nature of the presumption, but the Court has already concluded that allegations that the Medical Center Defendants failed to conduct further examinations of L.B.'s injuries are not a sufficient basis for a substantive due process claim. Allegations that this failure is attributable to the adoption and application of a medical presumption promulgated by the American Academy of Pediatrics do not affect that finding. Moreover, as recognized, "[t]he right to familial integrity . . . does not include a right to remain free from child abuse investigations," and that right must be balanced against "the compelling interests of the state in protecting children from abuse." Croft, 103 F.3d at 1125.  Government actors infringe on the right to familial integrity in a child abuse investigation only when their conduct "exceed[s] both negligence and deliberate indifference." Miller, 174 F.3d at 375-76. Thus, the fact that the Medical Center Defendants may have made inquiries of Mr. Billups and Ms. Rosario regarding L.B.'s medical history and whether she suffered an accidental trauma, cannot be sufficient to sufficiently allege an infringement of the right to familial integrity. Moreover, Plaintiffs have identified no legal authority indicating that government actors must be absolutely certain that a child's injuries are due to abuse before taking steps to serve "the compelling interests of the state in protecting children from abuse." Croft, 103 F.3d at 1125; see also Hatch v. Dep't for Children, 274 F.3d 12, 22 (1st Cir. 2001) ("[T]he government has a compelling interest in safeguarding children that it suspects are victims of abuse and in acting

quickly on their behalf.") (emphasis added).  Accordingly, the Court will dismiss Count II-A with prejudice.

> 3.    *Counts I-B and II-B: Fourth Amendment Claims Against the Medical Center and Drs. Choudhary, Crowell, and Dias*

Counts I-B and II-B raise Fourth Amendment claims against all of the Medical Center Defendants except for Dr. Eggli.  In Count I-B, Plaintiffs allege that the failure of the Medical Center Defendants to conduct additional examinations of L.B.'s injuries, and misrepresentations regarding the number of examinations that were conducted, resulted in Mr. Billups's incarceration because the Medical Center Defendants "knew, or should have known, that based on their conclusion the prosecutor and the court would find probable cause to arrest [Mr. Billups]."  (Doc. No. 59 ¶¶ 129-32.)  In Count II-B, Plaintiffs raise a substantially similar claim, the only crucial difference being that it alleges that the Medical Center Defendants' adoption of the American Academy of Pediatric's medical presumption resulted in Mr. Billups's incarceration.  (Id. ¶¶ 174-76.)

Neither Count I-B nor Count II-B specify the theory on which Plaintiffs' Fourth Amendment claims are based.  Viewing the allegations of the amended complaint in the light most favorable to Plaintiffs, the claims could be premised on theories of false arrest or malicious prosecution.  Either claim, however, fails as a matter of law.  To succeed on a false arrest claim under the Fourth Amendment, a plaintiff must demonstrate that he was arrested and that the arrest was made without probable cause.  Bell v. City of Harrisburg, 457 F. App'x 164, 166 (3d Cir. 2012).  To prove malicious prosecution, a plaintiff must show that: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendants initiated the proceeding without probable cause; (4) the defendants acted maliciously or for a

purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Johnson v. Kerr, 477 F.3d 75, 81-82 (3d Cir. 2007).

To state a claim against the Medical Center Defendants for false arrest and malicious prosecution, Plaintiffs must allege that the Medical Center Defendants had some control over Detective Frisby's decision to arrest Mr. Billups and had some control over the Franklin County District Attorney's decision to prosecute him, respectively. See, e.g., King v. Massarweh, 782 F. 2d 825, 829 (9th Cir. 1986). While Plaintiffs do allege that Detective Frisby and the Franklin County District Attorney relied on the medical opinions of the Medical Center Defendants, they do not allege that the Medical Center Defendants instructed, or even asked, Detective Frisby to arrest Mr. Billups. Likewise, they do not allege that the Medical Center Defendants instructed or asked the Franklin County District Attorney to prosecute Mr. Billups. In the absence of such allegations, Plaintiffs' Fourth Amendment claims must fail. See Angle v. Sabatine, No. 96-cv-6446, 1998 WL 54400, at *7 (E.D. Pa. Jan. 27, 1998) (finding that a third party could not be held liable for false arrest because there was no evidence that the third party ordered, or asked, the police to arrest the plaintiff); Morris v. Univ. of Va. Police Dep't, No. 96-0031, 1997 WL 129320, at *4 (W.D. Va. Mar. 19, 1997) (finding that a third party who only provided relevant evidence to the Commonwealth could not be held liable for the Commonwealth's decision to prosecute the plaintiff).

### 4. Count II-C: Failure-to-Train Claim Against the Medical Center

Count II-C raises a failure-to-train claim against the Medical Center pursuant to Monell. In essence, Plaintiffs' claim is premised on the theory that because the Medical Center has failed

to train its employees that they should not apply the American Academy of Pediatric's medical presumption in cases of suspected child abuse, the Medical Center has violated, and will continue to violate, parents' constitutional rights. Plaintiffs aver that the Medical Center Defendants have applied the presumption in other cases despite the fact that the presumption has been criticized in medical literature and case law. (Doc. No. 59 ¶¶ 167-71; 188-89, 191.)

A prima facie claim for failure to train requires plaintiffs to plead a "pattern of similar constitutional violations by untrained employees" which "demonstrate[s] deliberate indifference" to the rights of persons with whom the untrained employees come into contact. Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011). Plaintiffs "must identify a failure to provide specific training that has a causal nexus with their injuries . . . ." Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997). The Supreme Court defines deliberate indifference as follows:

> [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

Connick, 131 S. Ct. at 1360 (internal quotations and citations omitted).

The Court finds that Plaintiffs have failed to sufficiently state a failure-to-train claim. Although Plaintiffs' allegations indicate that the presumption is controversial, the Court declines to conclude that allegations that medical professionals applied a presumption officially promulgated by the American Academy of Pediatrics, which has never been retracted, is sufficient to state a constitutional claim. Such allegations do not indicate that constitutional

injuries due to the application of the presumption are "highly predictable" or "patently obvious." Connick, 131 S. Ct. at 1360; Brown, 520 U.S. at 409. Accordingly, the Court will dismiss Plaintiffs' failure-to-train claim with prejudice.

3. *Count VII: Claims Against the Medical Center and Dr. Eggli*

Count VII of Plaintiffs' amended complaint alleges that the Medical Center and Dr. Eggli denied Mr. Billups due process and the right to a fair trial in violation of the Fourth and Fourteenth Amendments by applying an expert witness policy in a discriminatory manner. (See Doc. No. 59 ¶ 259.) Specifically, Plaintiffs aver that Dr. Eggli, the chair of the Medical Center's radiology department, implemented a department policy, authorizing her to either approve or not approve the reports of Medical Center doctors in legal proceedings, deny liability insurance to those doctors whose reports were not approved, and bar doctors whose reports were not approved from revealing their employment status with the Medical Center or using the Medical Center logo and letterhead when creating reports. (Doc. No. 59 ¶ 11.)

According to Plaintiffs, in January 2010, Ms. Rosario sought a medical opinion regarding L.B.'s injuries from Dr. Julie Mack, an assistant professor of radiology at Penn State. (Id. ¶ 207.) Dr. Mack thereafter issued a report on L.B.'s injuries in which she disagreed with the conclusion that L.B.'s injuries were due to abuse. (Id. ¶ 214.) Plaintiffs aver that Dr. Dias spoke with Dr. Eggli regarding Dr. Mack's findings and demanded that Dr. Eggli forbid Dr. Mack from creating reports or testifying on behalf of criminal defendants or on behalf of parents in dependency proceedings. (Id. ¶ 222.) On October 1, 2010, Dr. Eggli allegedly sent Dr. Mack a letter regarding her report on L.B.'s injuries. (Id. ¶ 223.) In that letter, Dr. Eggli informed Dr. Mack that she "may not use [Medical Center] stationary or logo, nor . . . [her] title as faculty in

25

communications regarding this expert testimony . . . [and that her] testimony will not be covered insured or indemnified by the Department of Radiology or [the Medical Center]." (Id.) Due to the policy, Dr. Mack was neither permitted to testify that she was an assistant professor of radiology at Penn State nor covered by the Medical Center's liability insurance policy when she testified at Mr. Billups's trial. (Id. ¶ 232.) Conversely, Drs. Choudhary, Crowell, and Dias were allegedly covered by Medical Center liability insurance and were permitted to testify that they were employed by the Medical Center when they testified at the trial. (Id. ¶¶ 224-26, 229-31.)

According to Plaintiffs, the expert witness policy promulgated by Dr. Eggli "heavily discriminates in favor of physicians writing reports and testifying for the Commonwealth's prosecution and against physicians writing reports and testifying for defendants" and "undermines the judicial process by depriving judges and juries of information relevant and necessary to rendering fair and impartial decisions." (Doc. No. 59 ¶¶ 235, 237.) This policy, they contend, denied Mr. Billups due process and "the right to prepare a defense." (Id. ¶¶ 258-59.) In addition, Plaintiffs seek injunctive relief "to prohibit [the Medical Center] from withholding use of faculty title in communications, withholding use of [the Medical Center's] letterhead and logo, and withholding the benefit of liability insurance for physicians testifying for the defense . . . ." (Id. ¶ 260.)

First, upon review of Plaintiffs' claims that the expert witness policy denied Mr. Billups due process and the right to prepare a defense pursuant to the Fourth and Fourteenth Amendments, the Court finds that Plaintiffs have failed to sufficiently articulate these claims. As with their original complaint, Plaintiffs do not state the basis on which their Fourth Amendment claim is based; paragraph 258 of the amended complaint merely states that

Plaintiffs' Fourth Amendment rights were violated.  (Doc. No. 59 ¶ 258; <u>see also</u> Doc. No. 58 at 28.)  Moreover, the Court agrees with the Medical Center Defendants that the expert witness policy – even if discriminatorily applied against doctors testifying on behalf of criminal defendants – did not deprive Mr. Billups of due process or the right to a fair trial given that Dr. Mack did testify on Mr. Billups's behalf and a jury found him not guilty of all charges.  (Doc. No. 63 at 25; Doc. No. 72 at 10.)  Plaintiffs have failed to allege how the alleged prohibition on Dr. Mack identifying her employer, and the fact that she was not covered by the Medical Center's liability insurance policy, resulted in any constitutional injuries.

Second, the Court finds that Plaintiffs have failed to sufficiently allege that they have suffered an actual injury justifying the extraordinary remedy of an injunction.  Although Section 1983 authorizes equitable relief, an "injunction is to be used sparingly, and only in a clear and plain case."  <u>Rizzo v. Goode</u>, 423 U.S. 362, 378 (1976) (internal quotations omitted).  "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by continuing, present adverse effects."  <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 102 (1983) (internal quotations omitted); <u>see also</u> <u>Comfort ex rel. Neumyer v. Lynn Sch. Comm.</u>, 100 F. Supp. 2d 57, 64 (D. Mass. 2000) ("Injunctive relief is forward looking.  Courts cannot order the dismantling of a policy or program without any showing that the challenged action will cause some future harm to these litigants.  Past harm alone is not enough . . . .") (internal citations and quotation marks omitted).  Here, Plaintiffs have failed to even sufficiently allege that they suffered past harm due to the expert witness policy.  Even if they had, the Court finds their allegations that they may be subject to a hearing in the Commonwealth Court of Pennsylvania, during which Dr. Mack may be barred from testifying

that she is an assistant professor at Penn State, are purely speculative and not sufficient to justify the extraordinary relief that they request. Thus, the Court will dismiss Count VII with prejudice.

### 4. Immunity

Finally, the Court will address whether Drs. Choudhary, Crowell, and Dias are immune from liability with respect to the only surviving claim raised against them, that is, the substantive due process claim raised in Count I-A based on misrepresentations that they allegedly made regarding L.B.'s injuries. The Medical Center Defendants argue that Drs. Choudhary, Crowell, and Dias are entitled to absolute immunity because Plaintiffs allege that they "performed the function of child welfare workers," who "cannot be held liable for any claim arising from preparing for and prosecuting the dependency proceedings." (Doc. No. 63 at 18.) Indeed, child welfare workers are entitled to absolute immunity "for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency hearings." Ernst v. Child & Youth Servs. of Chester Cnty., 108 F.3d 486, 495 (3d Cir. 1997). This immunity extends to "the formulation and presentation of recommendations to the court in the course of such proceedings." Id. Absolute immunity, however, "does not extend to investigative or administrative acts." Miller, 174 F.3d at 376 n.6. In Miller, the Third Circuit found that a social worker who had investigated suspected child abuse and relayed his findings to an assistant city solicitor, the latter of whom presented evidence to the court, was not entitled to absolute immunity because his "acts were not analogous to those court-related functions normally performed by a prosecutor, and at times performed by social workers." Id.

Here, the amended complaint contains allegations that Drs. Choudhary, Crowell, and Choudhary are members of the Medical Center's Child Safety Team, which assists government

agencies by investigating, and rendering medical opinions regarding, injuries suspected to be due to child abuse. The amended complaint also avers that Franklin County obtained custody of L.B. and had filed a dependency petition before Drs. Choudhary, Crowell, and Choudhary concluded their investigation of her injuries. These allegations could support a finding that Drs. Choudhary, Crowell, and Choudhary's actions were taken on behalf of Franklin County in connection with the dependency proceeding. The allegations, however, could also support a finding that these Defendants' actions were purely investigative and not analogous to court-related functions. Accordingly, at this juncture, the Court cannot conclude that Drs. Choudhary, Crowell, and Dias are absolutely immune from liability.

### B.    The Franklin County Defendants' Motion for Partial Dismiss

Finally, the Court will consider the Franklin County Defendants' motion to dismiss Count III of Plaintiffs' amended complaint. In Count III, Plaintiffs allege that four policies promulgated by Franklin County denied them substantive due process.[5] (Doc. No. 59 ¶¶ 200-05.) Franklin County cannot be held liable under the theory of <u>respondeat</u> <u>superior</u>; rather, for Franklin County to be held liable, a person "who may be fairly said to represent official policy"

---

[5] Plaintiffs argue that these policies also violated their right to a presumption of innocence during the investigation of L.B.'s injuries. Parents, however, are not entitled to a presumption of innocence during the pendency of a child abuse investigation. <u>See</u> <u>Croft</u>, 103 F.3d at 125-26 (recognizing that parents do not have the right to be free from child abuse investigations and that children may be justifiably removed from the custody of their parents even where subsequent evidence demonstrates that no abuse occurred).

Further, in their brief in opposition, Plaintiffs make arguments concerning Franklin County's role in imposing a voluntary safety plan on Mr. Billups and Ms. Rosario. (Doc. No. 65 at 17-21.) Count III, however, contains no allegations pertaining to the voluntary safety plan. A complaint may not be amended by arguments proffered in a brief in opposition to a motion to dismiss. <u>See</u> <u>Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.</u>, 836 F.2d 173, 181 (3d Cir. 1988). Accordingly, the Court will disregard these improperly raised arguments.

must have caused a constitutional injury when "executing a government's policy or custom." See Monell, 436 U.S. at 691, 694-95. Plaintiffs have the burden to show a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385 (1989). A direct causal link can be shown where the municipality's failure to train "amounts to deliberate indifference to the rights of persons . . . ." See Roskos v. Sugarloaf Twp., 295 F. Supp. 2d 480, 487 (M.D. Pa. 2003).

First, Plaintiffs allege that Franklin County denied them due process because the Franklin County Defendants relied on the Medical Center Defendants' medical opinions pursuant to two Franklin County policies: (1) the policy of relying on medical professionals to explain the causes of injuries sustained by children in cases of suspected child abuse; and (2) the policy of not conducting an independent investigation of such injuries. (Doc. No. 59 ¶¶ 200, 202.) As the Court has noted, government actors infringe on parents' substantive due process rights when they consciously disregard a great risk that there had been no abuse. See, e.g., Ziccardi, 288 F.3d at 66. The Court must consider "whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference" with the parents' rights. Croft, 103 F.3d at 1126. "Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power." Id. Here, Plaintiffs have made no allegations, and advanced no arguments, supporting a finding that a policy of relying on medical professionals, who are experienced in assessing abuse-related injuries, violates due process. Likewise, no allegations or arguments support a finding that a policy of not requiring County employees, who presumably lack medical training and experience, to conduct medical investigations violates due process. Thus, Plaintiffs' substantive

30

due process claim based on these policies must fail.

Plaintiffs next allege that Franklin County denied them due process because Franklin County has the policy of "exclusively relying upon presumption tainted medical experts affiliated with the American Academy of Pediatrics" for medical investigations in cases of suspected child abuse" and the policy of not training those medical experts "that a presumption shifts the burden of proof in violation of due process." (Doc. No. 59 ¶¶ 201, 203.) The amended complaint, however, does not allege that Franklin County or its employees knew that the Medical Center Defendants applied such a presumption or even had knowledge of the existence of such a presumption. Moreover, the Court has already found that allegations that this presumption was applied in a child abuse investigation are not sufficient to state a substantive due process claim. Thus, Plaintiffs' substantive due process claim, to the extent that it is based on this policy, must be dismissed.

Finally, Plaintiffs contend that Franklin County has a "policy of failing to train the medical experts upon whom they exclusively rely about how a presumption shifts the burden of proof in violation of due process." (Id. ¶ 204.) A municipality's decision not to train "employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983" only when this failure amounts to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." Connick, 131 S. Ct. at 1359 (citation and internal quotation marks omitted). The deliberate indifference "standard of fault [requires] proof that a municipal actor disregarded a known or obvious consequence of his action." Id. at 1360 (citation and internal quotation marks omitted). In other words, for a municipality to be held liable, it must have disregarded "actual or

constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." Id. Thus, a plaintiff claiming there was a constitutional violation due to the municipality's failure to train should allege that the failure to train "amounted to conscious disregard" for his rights. See id. at 1365 (emphasis in original). Even if Franklin County had knowledge of the fact that the Medical Center Defendants applied the presumption promulgated by the American Academy of Pediatrics, the Court has already found that allegations of such actions are not a sufficient basis for a substantive due process claim and do not indicate that constitutional injuries due to such actions are highly predictable or patently obvious. Accordingly, the Court must dismiss the failure-to-train claim raised in Count III.

IV. **CONCLUSION**

Parents undoubtedly possess the right to make decisions concerning the upbringing of their children. This right, while fundamental, is not absolute. Law enforcement officials, medical professionals, child welfare workers, and prosecutors have the obligation to protect children from abuse, especially where parents abuse their own children. While severe and startling injuries suffered by a child may not always be attributable to abuse, government actors serve the compelling interests of the state when, in possession of reasonable and articulable evidence of abuse, they act efficiently and decisively to remove children from their parents' custody. Unfortunately, some parents may be subjected to the stressful and frustrating ordeal of defending against dependency petitions and criminal charges where they did not actually inflict harm on their children. Parents, however, possess neither the right to be free from child abuse investigations nor the right to be presumed innocent of having inflicted abuse.

In this case, Plaintiffs' constitutional claims principally concern the manner in which

government actors investigated L.B.'s injuries. Substantive due process claims based on the infringement of parents' rights to familial integrity will only survive a motion to dismiss where allegations in support of them indicate that government actors consciously disregarded a great risk that no abuse occurred. Here, the only allegations indicating such conscious disregard relate to the claim that Drs. Choudhary, Crowell, and Dias denied Plaintiffs substantive due process by making misrepresentations regarding their investigation of L.B.'s injuries. Accordingly, the Court will dismiss all other claims raised against the Medical Center Defendants, as well as the claims raised in Count III against Franklin County, with prejudice.

An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMEL BILLUPS, <u>et</u> <u>al.</u>,** | : | |
| Plaintiffs | : | |
| | : | **Civil Action No. 1:11-cv-01784** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **PENN STATE MILTON S. HERSHEY** | : | |
| **MEDICAL CENTER, <u>et</u> <u>al.</u>,** | : | |
| Defendants | : | |

**ORDER**

**AND NOW**, on this 20th day of November 2012, **IT IS HEREBY ORDERED THAT**

the Franklin County Defendants' motion for partial dismissal (Doc. No. 60) is **GRANTED**, and

Count III of Plaintiffs' amended complaint is **DISMISSED WITH PREJUDICE**. **IT IS**

**FURTHER ORDERED THAT** the motion to dismiss filed by the Penn State Milton S. Hershey

Medical Center Defendants (Doc. No. 61) is **GRANTED IN PART** and **DENIED IN PART** as

follows:

1. The motion is **GRANTED** with respect to Counts I-B, II-A, II-B, II-C, VII, and the substantive due process claim raised in Count I-A based on the Medical Center Defendants' failure to conduct further medical examinations of L.B.;

2. The motion is **DENIED** with respect to the substantive due process claim raised in Count I-A based on the misrepresentations allegedly made by Drs. Choudhary, Crowell, and Dias; and

3. The Clerk of Court is directed to **TERMINATE** Defendants Penn State Milton S. Hershey Medical Center and Dr. Kathleen Eggli, M.D., from this action.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania